FILED
United States Court of Appeals
Tenth Circuit

October 26, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

DANNY J. BOWLING,

       Plaintiff - Appellee,

v.

JOE RECTOR, individually, and as
Commissioned Agent of the Oklahoma
State Bureau of Investigation,

       Defendant - Appellant.

No. 07-6284

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 06-cv-859)**

Charles A. Brandt and Robert S. Lafferrandre, Pierce, Couch Hendrickson,
Baysinger & Green, L.L.P., Oklahoma City, OK, for Defendant-Appellant Joe
Rector.

April M. Davis (Stephen Jones with her on the briefs), Jones, Otjen & Davis,
Enid, OK, for Plaintiff-Appellee Danny J. Bowling.

Before **LUCERO, EBEL,** and **HARTZ**,

**EBEL**, Circuit Judge.

In this interlocutory appeal, Joe Rector challenges the district court's denial of his motion for summary judgment based on qualified immunity. Danny Bowling sued Rector and eight other defendants under 42 U.S.C. § 1983, alleging that they violated his constitutional right to be free from unreasonable search and seizure when Rector applied for and received a warrant to search Bowling's house and then executed that warrant.[1] Because we conclude that Rector was entitled to qualified immunity from liability for one of Bowling's claims under § 1983, we AFFIRM IN PART, REVERSE IN PART, and REMAND for further proceedings consistent with this opinion.

## I.    BACKGROUND

Bowling is an Oklahoma farmer and rancher who is in the business of raising and selling cattle. For more than a decade, Bowling has been financing his cattle operations by borrowing money from Farmers Exchange Bank ("FEB") (**id.**) and giving FEB a security interest in his cattle**.**

In January of 2006, FEB discovered that 800-850 head of Bowling's cattle in which it held a security interest were missing from the pastures where FEB had inspected them the previous September. The next month, invoking a provision in Bowling's promissory note and security agreement to the effect that "default

---

[1]Bowling's complaint also asserted causes of action for violation of his right to due process, conspiracy to violate his civil rights, invasion of privacy, trespass, conversion, intentional infliction of emotional distress, and destruction of property. Those causes of action are not at issue in this appeal.

occurs if [Bowling] fails to do something which causes [FEB] to believe that it will have difficulty collecting the amount owed to it," FEB initiated a foreclosure lawsuit against Bowling in Kay County, Oklahoma, district court. (App. at 40-41.) FEB's complaint alleged that the bank had "requested to be allowed to inspect cattle that comprise collateral for its loans," but that Bowling had not allowed such an inspection. (Id.)

When Bowling was deposed in July of 2006 pursuant to the foreclosure litigation, he testified that he believed FEB had been "running around taking [his] cattle." (Id. at 295.) Bowling explained, "I have lost some cattle, yes. . . . I would assume the bank has taken it, what I have missing." (Id. at 296.) His losses of cattle, he said, had occurred in the prior "[s]ix or eight months." (Id. at 298.) When pressed as to the locations from which the missing cattle had disappeared, Bowling responded, "I can't remember exact. I know I had some in Noble County stolen. I had some from my pens. I don't know if they are stolen, if the bank has taken them or what because I have no correspondence." (Id. at 296.) He went on to testify that he was "not saying [the cattle] were stolen," but rather was "saying the bank probably got them." (Id. at 297.) He testified further that he had filed sheriff's reports in both Noble County and Kay County when his cattle disappeared.

The week after Bowling's deposition in the foreclosure litigation, FEB's president, Dennis Buss, telephoned Rector. Buss had seen Rector, a "Special

Ranger" with the Oklahoma State Bureau of Investigations ("OSBI") and field inspector with the Texas and Southwestern Cattle Raisers Association ("TSCRA"), featured in a television news segment about investigations of cattle theft in Oklahoma City. During their initial conversation, Buss told Rector that the bank had "taken a deposition of a customer the previous week and that there were cattle stolen and missing." (Id. at 133.) Buss also told Rector that the bank had a security interest in the missing cattle. Buss asked Rector to meet with him and FEB's attorney and officers to discuss the situation, and Rector agreed.

At the July 14, 2006, meeting, Buss told Rector that Bowling had been selling cattle in the names of his mother and son, and that FEB had not received proceeds from any of these sales. Buss also provided Rector with a number of documents related to Bowling's loans and security agreements with FEB, as well as documents relating to certain livestock sales. Based on this information, Rector made an initial determination that "it was pretty obvious a crime had been committed" when Bowling "didn't sell the cattle in his name so that the bank could receive the proceeds" based on its security interest. (Id. at 117.) Rector advised Buss and the FEB officers that he would "conduct a criminal investigation" into the matter, "with the understanding that charges would be filed if [he] could make a case." (Id. at 118.)

Three days after meeting with the FEB personnel, Rector prepared an affidavit for a warrant to search Bowling's home. The affidavit identified Rector

as a "Special Ranger . . . employed by Texas and Southwestern Cattle Raisers Association" and averred that Rector had "over fifteen years of law enforcement experience" and was "responsible for conducting investigations into criminal activity throughout the state of Oklahoma." (Id. at 149.) It further averred that Rector was commissioned by the OSBI, had statewide jurisdiction pursuant to that commission, and had "solved hundreds [of] crimes committed in the state of Oklahoma." (Id.) Having specified that items to be named in the warrant were "subject to seizure for the following reasons: Bank Fraud-Sale of Mortgaged Property," the affidavit concluded with a list of "facts tending to establish . . . grounds for issuance of the Search Warrant."[2] (Id. at 148, 149-50.)

After preparing the affidavit for search warrant, Rector contacted OSBI Special Agent John Laughy, who agreed to meet Rector the next morning to bring the application and affidavit for search warrant to the Kay County Courthouse. Laughy called the courthouse to ensure that Judge D.W. Boyd would be available the next morning to receive the application and affidavit. After meeting with Laughy and Rector on July 18, 2006, Judge Boyd signed the warrant, which was directed to "Any Sheriff, Police Officer, or Law Enforcement Officer in the County of Kay." (Id. at 157.) Based on "[p]robable cause having been shown . . . by the affidavit of Special Ranger Joe Rector," the warrant authorized a search of Bowling's residence for

---

[2]Rector's list of facts is summarized in section II.C.1.b.iii, infra.

[b]ank statements, bank records, drive in tickets[3] and other documents related to the sale of cattle and cattle purchase/sale transactions, ledgers, and other records dealing with the purchase/sale of cattle. Computers, computer disks, computer hard drives and other related information storage devices. Receipts for the sale of cattle. Any papers, receipts, or other documents dealing with cattle. Large uncashed checks or large amounts of cash which could represent the proceeds from the sale of cattle Farmers Exchange Bank of Tonkawa had a lien on.

(Id. at 157 (footnote added).) The warrant further authorized a search for "articles of personal property tending to establish the identity of the person or persons in control or possession of the place or vehicle" at Bowling's address. (Id.)

Having secured the warrant, Rector and Laughy went to the Kay County sheriff's office, where they met with the undersheriff. Rector and Laughy asked if someone from the sheriff's office could accompany them as they executed the warrant. When the undersheriff told them that the office was shorthanded, Laughy called the Tonkawa, Oklahoma, police chief to ask that several of his officers attend the search. Rector and Laughy met the Tonkawa police chief and his officers in Tonkawa, where they drove to Bowling's house and executed the warrant. Rector, who was "in charge," performed the search with Laughy's assistance; the Tonkawa officers "just stood around." (Id. at 122.)

---

[3]A drive-in ticket is "a document that's filled out when the individual [selling cattle] pulls up to the pens to unload the cattle." (App. at 119.)

Rector testified at his deposition that "[a]t some point" when he "wasn't in the room," Laughy "moved a couch and they found some marijuana" underneath. (Id. at 122.)  Rector informed the Tonkawa officers that he does not "get involved in that kind of stuff," and that "[i]f they wanted to do something to make a case, then they could handle that part of it."  (Id.)  Rector did not examine the marijuana, but "[s]omebody borrowed [his] camera and they took some photographs of the contraband."  (Id.)

Three days after executing the warrant, on July 21, 2006, Rector submitted to Judge Boyd the Return and Inventory from the search.  Rector averred that the items seized from Bowling's residence were as follows:

1.  DTN computer S/N FF01148B
2.  EMACHINES CPU S/N CK85BD0005130
3.  Dell Laptop Inspir[on] 5150 S/N CNOW940-1261-485-2680
4.  Bag of frozen mushrooms (CDS)
5.  Plastic bag containing 3 bags of Marijuana
6.  2 Marijuana pipes with residue in them
7.  Plastic bag with syringes in it
8.  Box with several bottles of steroids and syringes in it
9.  $4400.00 in cash all in 100.00 bills
10. 103 statements from R.J. O'Brien
11. 1 used check pad from Farmers Exchange Bank with Danny Bowling's name on it.
12. 3 bank statements from First National Bank of Oklahoma
13. 1 bank statement from First State Bank of Fairfax
14. 2 bank statements from Superior Federal Bank
15. 1 bank statement from Farmers Exchange Bank
16. 1 bank statement from BancFirst
17. 1 letter from the US Department of Agriculture addressed to Danny Bowling
18. 1 statement from Cable One addressed to Danny Bowling

(Id. at 159.)

Bowling filed suit in federal court less than a month later, asserting a number of state-law claims as well as a claim under § 1983 for violation of his Fourth Amendment right to be free from unreasonable search and seizure. In relevant part, Bowling's complaint alleged that Rector had exceeded his limited statutory authority as an OSBI Special Ranger when he applied for a warrant to investigate bank fraud and sale of mortgaged property, when Oklahoma law dictates that Special Rangers may only enforce laws pertaining to the larceny of livestock. The complaint further alleged that Rector had impermissibly "interfere[d] in a civil lawsuit"–FEB's foreclosure litigation against Bowling–"by searching [Bowling's] home for items related to the civil lawsuit." (Id. at 29.) While Bowling had not yet received a copy of the Return and Inventory when he filed his complaint, he alleged, as part of a claim that the search warrant was unconstitutionally overbroad, that the officers who executed the warrant "took items that were completely unrelated to [his] dispute with FEB" over the missing cattle. (Id. at 32-33.)

Rector moved for summary judgment, raising the defense of qualified immunity on Bowling's § 1983 claims. In response, Bowling argued that Rector's conduct violated Bowling's Fourth Amendment right to be free from unreasonable search and seizure because (1) by requesting and executing a search warrant for the investigation of bank fraud, Rector acted outside the scope of his limited statutory authority to investigate the larceny of livestock; (2) the search warrant

- 8 -

was unconstitutionally overbroad; (3) Rector impermissibly used a criminal search warrant in a civil proceeding; and (4) Rector lacked probable cause to believe a crime had been committed that he was authorized to investigate.

The district court denied Rector's motion for summary judgment as to all but one of Bowling's claims and concluded that Rector was not entitled to qualified immunity from liability under § 1983. The court first found that there was "a genuine dispute" of material fact as to whether Rector "was acting within the scope of [his] authority" in applying for and executing the warrant. (Dist. ct. order at 4.) It likewise found a "genuine dispute with regard to the reasonableness of the manner in which the warrant . . . was executed," explaining that "[q]uestions exist not only regarding whether the number of items seized was excessive, but also regarding whether the seized items were fairly encompassed in the description of the items to be seized." (Id. at 6.) The district court then concluded that Rector was not entitled to qualified immunity because Bowling's allegations established "that Rector violated Bowling's constitutional rights in [both] obtaining and executing the search warrant," and "a reasonable law enforcement officer, statutorily charged with limited authority, could not have believed that his investigation fell within that authority or that his execution of an invalid warrant or his improper execution of a valid warrant was lawful." (Id. at 7.)

Rector timely appealed the denial of his motion for summary judgment based on qualified immunity.

## II.    DISCUSSION

### A.    *Jurisdiction*

Because this is an interlocutory appeal from a denial of summary judgment, our jurisdiction under 28 U.S.C. § 1291 is limited.  In general, the denial of a summary judgment motion is not an appealable final order under § 1291.  McFall v. Bednar, 407 F.3d 1081, 1086 (10th Cir. 2005).  Such a denial "is subject to appeal, however, when the defendants are public officials asserting a qualified immunity defense and the appealed issue is whether a given set of facts establishes that defendants violated clearly established law."  Bass v. Richards, 308 F.3d 1081, 1086 (10th Cir. 2002); see Johnson v. Jones, 515 U.S. 304, 311 (1995) (citing Mitchell v. Forsyth, 472 U.S. 511, 528 (1985)).

This limitation means that we may consider Rector's appeal only insofar as it presents "neat abstract issues of law"; Rector "may not appeal [the] district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial."  Johnson, 515 U.S. at 317, 319-20 (quotation omitted).  Thus, it is not our province "to determine whether the record supports the district court's factual assumptions"; instead, we "'simply take, as given, the facts that the district court assumed when it denied

summary judgment for [a] (purely legal) reason.'" Dixon v. Kirkpatrick, 553 F.3d 1294, 1301 (10th Cir. 2009) (quoting Johnson, 515 U.S. at 319).

B.      *Standard of review*

We review de novo the district court's denial of a summary judgment motion asserting qualified immunity, and we apply the same legal standard that the district court applied. Poolaw v. Marcantel, 565 F.3d 721, 728 (10th Cir. 2009). "Summary judgment should be granted 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Martinez v. Beggs, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). We consider the evidence in the light most favorable to the non-moving party, Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007) (en banc); here, that party is Bowling.

"Because of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions." Id. at 1114 (quotation omitted). Upon the defendant's assertion of the qualified immunity defense, the burden shifts to the plaintiff, who must "meet a strict two-part test" by showing "(1) that the defendant violated a constitutional or statutory right, and (2) that this right was clearly established at the time of the defendant's conduct." Cassady v. Goering, 567 F.3d 628, 634 (10th Cir. 2009) (quotation omitted). We may, at our

- 11 -

discretion, consider the two parts of this test in the sequence we deem best "in light of the circumstances in the particular case at hand."  Pearson v. Callahan, — U.S. —, 129 S. Ct. 808, 818 (2009).

Our inquiry into whether a constitutional right was clearly established "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  Cortez, 478 F.3d at 1114 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).  This case-specific inquiry asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation."  Id. (quotation omitted).  "Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful."  Id.  Furthermore, a right is clearly established only if there is "'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains.'"  Id. at 1114-15 (quoting Medina v. City of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).  This prior caselaw need not address a situation factually identical to that of a defendant officer, but it must "provide fair warning that [the] officer's conduct would violate constitutional rights."  Marshall v. Columbia Lea Reg'l Hosp., 474 F.3d 733, 740 (10th Cir. 2007) (quotations omitted).

C.    *Bowling's Fourth Amendment claims under § 1983*

In their briefs and at oral argument, both Bowling and Rector focused almost exclusively on the claim that Rector violated Bowling's right to be free

from unreasonable search and seizure when Rector applied for and executed the warrant in excess of his statutory jurisdiction as an OSBI Special Ranger. Indeed, in oral argument, we asked the parties for supplemental briefing on the single issue of the constitutional validity of a search warrant obtained outside of an affiant's scope of authority.

However, the district court clearly interpreted Bowling's complaint as alleging, under § 1983, two separate Fourth Amendment violations: one violation for Rector's obtaining a warrant that was invalid because its subject matter lay outside the scope of his lawful authority, and a second violation for the manner in which he executed that warrant, even if it were valid. In its order on Rector's motion for summary judgment, the court thus explained that "Bowling has contended that because Rector did not have reasonable grounds to believe that he could investigate . . . , no valid warrant was issued or executed," and that "Bowling has further contended that because Rector's seizure of certain property exceeded the terms of the search warrant, . . . Rector's execution of the warrant was unreasonable." (Dist. ct. order at 5.)

Accordingly, the court ruled separately that "there is a genuine dispute in this case with regard to the reasonableness of Rector's actions in conducting the investigation in light of his limited authority and in seeking a search warrant," and that "there is a genuine dispute with regard to the reasonableness of the manner in which the warrant, even if valid, was executed." (Dist. ct. order at 5,

- 13 -

6.) In its qualified immunity analysis, the court concluded "that Rector violated Bowling's constitutional rights in obtaining <u>and</u> executing the search warrant," and "that a reasonable law enforcement officer, statutorily charged with limited authority, could not have believed that his investigation fell within that authority or that his execution of an invalid warrant or his improper execution of a valid warrant was lawful." (<u>Id.</u> at 7 (emphasis added).)[4]

In conformity with the district court's interpretation of the complaint and its ruling on the motion for summary judgment, we address, in turn, (1) whether Rector is entitled to qualified immunity from Bowling's § 1983 claim that Rector applied for and executed an invalid warrant when he acted outside his statutory jurisdiction; and (2) whether Rector is entitled to qualified immunity from Bowling's § 1983 claim that even if the warrant were valid, Rector exceeded the scope of the warrant when he executed it.

1. <u>Invalidity of warrant due to Rector's acting outside his statutory jurisdiction</u>

a. Rector's authority as a Special Ranger under Oklahoma law

---

[4]Rector twice noted in his opening brief that the district court "questioned the reasonableness of [his] method of execution of the warrant" (Aplt. br. at 23). However, aside from Rector's fleeting comments that the district court did not provide "specific analysis" of the execution issue and that Bowling did not put on "specific evidence" as to the method of execution, neither Rector nor Bowling made any argument to this court as to why the district court's conclusion of law as to the execution claim–i.e., that Bowling had met his burden of demonstrating that Rector's conduct violated his clearly established constitutional rights–was either correct or in error.

- 14 -

At all times relevant to Bowling's claims against him, Rector was commissioned by the OSBI as a "Special Officer known as a Ranger." (App. at 468, 469-71.) Pursuant to Okla. Stat. Ann. tit. 74, § 150.13, this commission authorized Rector to "enforce[] . . . the provisions of the Oklahoma Statutes relating to larceny of domestic animals, livestock or farm and ranch equipment or supplies." (Id. at 468.) Oklahoma law provides that "with respect to" enforcement of those provisions of the Oklahoma Statutes, Special Rangers "shall have the same authority as any other peace officer." Okla. Stat. Ann. tit. 74, § 150.13(A).

In denying Rector's motion for qualified immunity on this claim, the district court assumed that Bowling's version of events was correct. Mindful that "[i]t is not [our] job . . . to determine whether the record supports the district court's factual assumptions," Dixon, 553 F.3d at 1301, we ask, in our de novo review, simply whether Rector's alleged conduct in excess of his statutory authority violated Bowling's clearly established rights under the Fourth and Fourteenth Amendments.

<blockquote>
b. Whether Rector's conduct violated Bowling's rights under the Fourth and Fourteenth Amendments

i. State-law violations and the Fourth Amendment
</blockquote>

We have made clear that "[a] state-law violation does not . . . necessarily rise to the level of a federal constitutional violation" under the Fourth

Amendment.  United States v. Gonzales, 535 F.3d 1174, 1182 (10th Cir. 2008).

Indeed, in our analysis of the constitutionality of Rector's alleged conduct, "the

question . . . is not whether the search was authorized by state law.  The question

is rather whether the search was reasonable under the Fourth Amendment."

Cooper v. California, 386 U.S. 58, 61 (1967).  "Just as a search authorized by

state law may be an unreasonable one under that amendment, so may a search not

expressly authorized by state law be justified as a constitutionally reasonable

one."  Id.  In short, while states may "choose[] to protect individual privacy and

dignity more than the Fourth Amendment requires," a state's restrictions on

search and seizure "do not alter the Fourth Amendment's protections."  Virginia

v. Moore, — U.S. —, 128 S. Ct. 1598, 1606, 1607 (2008); see also United States

v. Sawyer, 441 F.3d 890, 899 (10th Cir. 2006) (explaining that in the context of

claims that violations of state law constitute violations of the Fourth Amendment,

"[t]he touchstone of our jurisprudence remains whether the conduct in question

contravenes the federal constitution"); United States v. Green, 178 F.3d 1099,

1105 (10th Cir. 1999) ("It is . . . well established in this circuit that . . . the test of

reasonableness in relation to the Fourth Amendment . . .  must be determined by

Federal law even though the police actions are those of state police officers."

(quotations omitted)).

   While state law thus "is not determinative of the federal question" of a

Fourth Amendment violation, state law "may or may not be relevant to the

determination of the federal question." Sawyer, 441 F.3d at 899; see also United States v. Mikulski, 317 F.3d 1228, 1232 (10th Cir. 2003) ("'A police violation of state law does not establish a Fourth Amendment violation. However, the question of compliance with state law may well be relevant in determining whether police conduct was reasonable for Fourth Amendment purposes.'" (quoting United States v. Baker, 16 F.3d 854, 856 n.1 (8th Cir. 1994) (in parenthetical)). We have explained that state law is most relevant–and that it becomes "highly determinative" of Fourth Amendment questions–"only when the constitutional test [at issue] requires an examination of the [pertinent] state law or interests." Gonzales, 535 F.3d at 1182 (quotation omitted). Such constitutional tests include those for "exigent circumstances justify[ing] a warrantless search" and those for inventory searches, both of which "involve a special incorporation of state law into Fourth Amendment jurisprudence." Id. at 1182-83 (quotation omitted).

In this case, the federal test at issue–that for search and seizure pursuant to a warrant–involves no such "special incorporation of state law," id. at 1183, into the Fourth Amendment analysis. "The Fourth Amendment requires that search warrants be issued only 'upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" Dalia v. United States, 441 U.S. 238, 255 (1979) (quoting U.S. Const.

amend. IV). "Finding these words to be precise and clear," the Supreme Court

"has interpreted them to require only three things":

> First, warrants must be issued by neutral, disinterested magistrates.
> Second, those seeking the warrant must demonstrate to the magistrate
> their probable cause to believe that the evidence sought will aid in a
> particular apprehension or conviction for a particular offense.
> Finally, warrants must particularly describe the things to be seized,
> as well as the place to be searched.

Id. (citations, quotations omitted). We have explained that these requirements

serve "at least two distinct purposes": ensuring that no "'intrusion in the way of

search or seizure'" occurs "'without a careful prior determination of necessity,'"

and preventing the "'specific evil [of] the "general warrant" abhorred by the

colonists.'" Cassady, 567 F.3d at 634-35 (10th Cir. 2009) (quoting Coolidge v.

New Hampshire, 403 U.S. 443, 467 (1971)).

Because this constitutional test does not "require[] an examination of . . .

state law or interests," Gonzales, 535 F.3d at 1182, Rector's alleged violation of

Oklahoma law is not, without more, significantly relevant to our Fourth

Amendment analysis.

                    ii.     Officer jurisdiction and the Fourth Amendment

Bowling alleges that Rector exceeded his statutory authority–and thus acted

outside his jurisdiction–in seeking and executing the search warrant. We have not

decided a Fourth Amendment case in which a limited-authority officer such as

Rector acted outside his jurisdiction over particular subject matters under state

- 18 -

law.  However, we have held that a search conducted pursuant to a warrant obtained outside the requesting and executing officer's territorial jurisdiction does not constitute a per se violation of the Fourth Amendment.  Green, 178 F.3d at 1106.  Instead, we evaluate such a search by the well-established "federal constitutional standards for evaluating the validity of search warrants."  Id.  We will conclude that Fourth Amendment requirements are "satisfied where . . . officers obtain a warrant, grounded in probable cause and phrased with sufficient particularity, from a magistrate of the relevant jurisdiction authorizing them to search a particular location, even if those officers are acting outside their jurisdiction as defined by state law."  Id. (emphasis added, footnote omitted); see also Sawyer, 441 F.3d at 895 (applying federal test for determining validity of consent to search where Kansas police officers acted outside of their statutory jurisdiction and in violation of Oklahoma law in obtaining defendant's consent to search his business premises, and concluding that this inquiry "[did] not require an analysis of the legal parameters of the Kansas Officers' jurisdictional authority under state law").

The Supreme Court's recent decision in Virginia v. Moore reinforces this principle.  In Moore, several Portsmouth, Virginia, police officers stopped and arrested David Lee Moore for the misdemeanor offense of driving with a suspended license.  128 S. Ct. at 1601.  Under Virginia law, the officers were not authorized to arrest Moore for driving with a suspended license except under

circumstances that did not apply in his case. Id. at 1602. State law dictated that the officers should have issued Moore a summons rather than arresting him. Id. When they searched Moore incident to this arrest made in excess of their statutory jurisdiction, the officers discovered crack cocaine and cash on his person, and he subsequently was charged with possessing cocaine with intent to distribute. Id.

Reversing the Virginia Supreme Court, the Court held that regardless of the legality of the officers' conduct under state law, that conduct must be evaluated by Fourth Amendment standards for warrantless arrests and searches pursuant to such arrest. Id. at 1607-08. Because those standards dictate that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution," and that "officers may perform searches incident to constitutionally permissible arrests in order to ensure their safety and safeguard evidence," Moore's arrest in excess of the officers' statutory authority nonetheless passed Fourth Amendment muster. Id. at 1607. "[T]he arrest rules that the officers violated were those of state law alone, and . . . it is not the province of the Fourth Amendment to enforce state law." Id. at 1608.

While Green, Sawyer, and Moore are not precisely on point with the case before us, we think the principle articulated by those cases–that for Fourth Amendment purposes, the conduct of officers acting in excess of their statutory authority must be tested by traditional Fourth Amendment standards–applies with equal force here. We thus agree with the approach of the Eighth Circuit in United

States v. Freeman, 897 F.2d 346 (8th Cir. 1990), a case with facts fairly similar to those alleged by Bowling.

In Freeman, Thomas Ley, a special agent for the Missouri Department of Revenue, was authorized to investigate possible violations of state law related to automobile tampering, but was not statutorily designated a state "peace officer." Id. at 346-47. Under the Missouri statutes, only peace officers and prosecuting attorneys may apply for search warrants. Id. at 347 n.2 (citing Mo. Rev. Stat. § 542.276.1). Despite his lack of statutory authority to do so, Ley applied for a warrant to search certain premises, submitting a supporting affidavit establishing probable cause for the search. Id. The affidavit identified Ley as a special agent with the state Department of Revenue, but neither it nor the warrant application form informed the judge reviewing the application that Ley was not a peace officer empowered under state law to seek a search warrant. Id.

On the basis of Ley's application and affidavit, the state judge issued a warrant directed to "any peace officer in the state of Missouri." Id. With the assistance of a state police officer and a county deputy sheriff, Ley searched the named premises and seized evidence that he later identified on the official return and inventory he completed. Id. After a federal grand jury indicted Anthony Freeman based on the evidence seized in this search, Freeman moved to suppress on the ground that because Ley was not statutorily authorized to apply for or execute a search warrant, the search was impermissible under the Fourth

Amendment. Id. The Eighth Circuit held that "the record as a whole demonstrates that no constitutional violation occurred [because] the affidavit supporting the search warrant provided probable cause to search and the search warrant described with particularity the place to be searched and the items to be seized." Id. at 350. The court characterized Ley's conduct in excess of his statutory jurisdiction as an example of "procedural violations which do not implicate the constitutional values of probable cause or description with particularity of the place to be searched and items to be seized." Id. at 348. As the Supreme Court did in Moore and we did in Green and Sawyer, the Eighth Circuit thus tested by traditional Fourth Amendment standards the actions of an officer acting in excess of his statutory authority.

Applying the reasoning of Moore, Green, Sawyer, and Freeman, we turn to an evaluation of Rector's conduct by well-established "federal constitutional standards for evaluating the validity of search warrants," Green, 178 F.3d at 1106.

### iii. Validity of the warrant

To be valid under the Fourth Amendment, the warrant to search Bowling's residence must meet three requirements: (1) it must have been "issued by [a] neutral, disinterested magistrate[]"; (2) "those seeking the warrant must [have] demonstrate[d] to the magistrate their probable cause to believe that the evidence sought [would] aid in a particular apprehension or conviction for a particular offense"; and (3) the warrant must "particularly describe the things to be seized,

- 22 -

as well as the place to be searched." Dalia, 441 U.S. at 255 (citations, quotations omitted).

As to the first requirement, the warrant was issued by Kay County, Oklahoma, district court judge D.W. Boyd. Nothing in the record indicates that Judge Boyd was other than a neutral and disinterested magistrate.

As to the second requirement, Bowling argues that the warrant was invalid because Rector subjectively lacked "probable cause to believe a crime had been committed that he could investigate." (App. at 207; see Aple. Br. at 17-20.) Yet the standard for probable cause is subjective only to the extent that "the facts and circumstances within [the affiants'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (quotations omitted); see also Brigham City, Utah v. Stuart, 547 U.S. 398, 404-05 (2006). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." Brinegar, 338 U.S. at 175 (quotation omitted). As specifically applied to searches, "[p]robable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Grubbs, 547 U.S. 90, 95 (2006) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Here, Rector's affidavit included the following "grounds for issuance of the Search Warrant":

(1)    His July 11, 2006, telephone call from Buss, in which Buss informed him that FEB customer Bowling had "sold over 800 head of cattle that were valued at $750,000.00," and that the bank had a lien on those cattle but had not received any proceeds from their sale;

(2)    His review of FEB's documentation of its UCC and EFS filings establishing the bank's security interest in the cattle;

(3)    His conversation with Buss regarding FEB's inspections and inventories of Bowling's cattle, with those inspections and inventories showing that Bowling had owned 883 head of cattle in September of 2005 and that none of those remained in the fields where they previously had been pastured;

(4)    Buss's statement that during Bowling's deposition in the foreclosure litigation, Bowling had testified that "he no longer had any of the cattle and he didn't have any of the proceeds from the sale of the cattle"; and

(5)    Rector's examination of evidence showing that Bowling had, in 2004 and 2005, sold cattle in the names of his mother and his son, without remitting to FEB any of the proceeds from those sales.

(6)    Rector's experience in cattle theft cases leading him to believe that there would be large numbers of documents, large amounts of cash (or bank records showing large cash transactions), and computerized business records at Bowling's residence as a result of recent cattle sales.

(App. at 149.)  This information was sufficient to "warrant a man of reasonable caution in the belief" that a crime[5] had been committed, Brinegar, 337 U.S. at 175, and that there was a fair probability that evidence of that crime would be found in Bowling's residence, Grubbs, 547 U.S. at 95.

_____

[5]The warrant specified the crime at issue as "Bank Fraud–Sale of Mortgaged Property."  (App. at 157.)

- 24 -

As to the third requirement, Bowling argues that the warrant was impermissibly overbroad in its description of what could be seized at his residence. We have held that the constitution compels the warrant's description of "'the items to be seized with as much specificity as the government's knowledge and circumstances allow.'" Cassady, 567 F.3d at 635 (quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)). "[W]arrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Id. (quotation omitted). Here, the warrant specified that the executing peace officers had authority to seize

> [b]ank statements, bank records, drive in tickets and other documents related to the sale of cattle and cattle purchase/sale transactions, ledgers, and other records dealing with the purchase/sale of cattle. Computers, computer disks, computer hard drives and other related information storage devices. Receipts for the sale of cattle. Any papers, receipts, or other documents dealing with cattle. Large uncashed checks or large amounts of cash which could represent the proceeds from the sale of cattle Farmers Exchange Bank of Tonkawa had a lien on.

(App. at 157.) The warrant further authorized a search for "articles of personal property tending to establish the identity of the person or persons in control or possession of the place or vehicle" at Bowling's residence. (Id.) That description satisfactorily identifies "the distinguishing characteristics of the goods to be seized," Cassady, 567 F.3d at 635 (quotation omitted).

c.    Conclusion as to this issue

We conclude that the warrant was valid under the Fourth Amendment.

Whether or not Rector's alleged conduct in seeking the warrant violated

Oklahoma law, it did not violate Bowling's constitutional rights.  Therefore,

Bowling failed to meet the first part of the "strict two-part test" to overcome an

assertion of qualified immunity, Cassady, 567 F.3d at 634, and Rector is entitled

to qualified immunity on this claim.

Consequently, as to Bowling's § 1983 claim that Rector violated his

constitutional rights by obtaining a warrant outside the scope of Rector's lawful

authority as a Special Ranger, we REVERSE the district court's denial of

Rector's summary judgment motion.

2.    Constitutional violation in Rector's execution of the warrant[6]

a.    Whether Rector's conduct violated Bowling's rights
      under the Fourth and Fourteenth Amendments

The district court found that there was a genuine dispute of material fact as

to whether, in executing the warrant, Rector seized an excessive number of items

or items that were not "fairly encompassed in the description of items to be

seized."  (Dist. ct. order at 6.)  We do not review that finding, but simply ask

---

[6]Because Rector does not fairly present this issue in his briefs or argument
on appeal, we could alternatively decline to address this aspect of the district
court's ruling.  We address it on the merits only because of the several isolated
unargued references to this issue in Rector's brief and because it is easy to affirm
the district court on this ruling.

whether Rector violated Bowling's Fourth Amendment rights by exceeding the scope of the warrant when he executed the search.  See Dixon, 553 F.3d at 1301.

The Fourth Amendment's particularity requirement targets the constitutional evil of "general exploratory rummaging in a person's belongings" pursuant to a warrant.  United States v. Carey, 172 F.3d 1268, 1272 (10th Cir. 1999).  Where, as here, a warrant clearly and precisely specifies items to be seized, and the officers executing the warrant seize additional items, those officers act unreasonably for Fourth Amendment purposes unless their conduct may be justified under an exception to the warrant requirement, such as the plain-view exception.  See Horton v. California, 496 U.S. 128, 138-42 (1990); United States v. Angelos, 433 F.3d 738, 744-47 (10th Cir. 2006); Carey, 172 F.3d at 1271-76..

Therefore, in allegedly exceeding the scope of the search warrant, Rector violated Bowling's rights under the Fourth and Fourteenth Amendments.

                b.      Whether the constitutional right was clearly established at the time of Rector's conduct

The search at issue took place on July 18, 2006.  By 1927, the Supreme Court had held that "[t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another."  Marron v. United States, 275 U.S. 192, 196 (1927).  And in 1990, the Court explained that "[i]f the

- 27 -

scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." Horton, 496 U.S. at 140.

As it would have been clear to a reasonable officer in July of 2006 that exceeding the scope of a search warrant was unlawful, the constitutional right at issue was clearly established at the time of Rector's conduct. See Cortez, 478 F.3d at 1114.

### c. Conclusion as to this issue

Because Rector's alleged conduct in exceeding the scope of the search warrant violated Bowling's clearly established right under the Fourth Amendment, the district court correctly concluded that Rector was not entitled to qualified immunity on this claim. Thus, as to Bowling's § 1983 claim that Rector violated his constitutional rights by exceeding the scope of the search warrant, we AFFIRM the district court's denial of Rector's summary judgment motion.

## III. CONCLUSION

We REVERSE the district court's denial of Rector's summary judgment motion on the claim that Rector violated Bowling's constitutional rights by obtaining a warrant outside the scope of Rector's lawful authority as a Special Ranger. We AFFIRM the district court's denial of Rector's summary judgment motion on the claim that Rector violated Bowling's constitutional rights by

exceeding the scope of the warrant.  The case is remanded for further proceedings

consistent with this opinion.