FILED
United States Court of Appeals
Tenth Circuit

May 10, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

KEVIN K. KING,

Plaintiff-Appellee,

v.

DAVE PATT; DARREL MCCOY;
LYLE STOREY; SPENCER DOBSON;
JON NEIGHBOR,

Defendants-Appellants.

No. 12-4107
(D.C. No. 2:04-CV-00829-TC-PMW)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **HOLLOWAY**, Senior Circuit Judge, and
**TYMKOVICH**, Circuit Judge.

Plaintiff Kevin K. King, a pro se inmate, brought this civil rights case against

defendants alleging they had been deliberately indifferent to his serious medical

needs. The defendants moved for summary judgment asserting qualified immunity

from suit. The district court denied their motion, and they filed this interlocutory

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of this
appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

appeal. We affirm the district court's determination that Mr. King's placement on work release did not insulate defendants from his Eighth Amendment claims, and we reject defendants' contention that Mr. King's claims fail as a matter of law for lack of expert medical testimony concerning causation. We dismiss the defendants' remaining claims for lack of appellate jurisdiction.

## BACKGROUND

Mr. King alleges that the defendants violated the Eighth Amendment by failing to provide adequate care for his broken wrist and detached retina. The defendants, sued in their individual capacities, are officials at the Washington County Jail (Jail) where Mr. King was held on a parole violation. They include the Jail Commander, Jon Neighbor, charged with denying Mr. King's grievances concerning his medical care; Nurse David Patt,[1] who supervised and was directly involved with his medical care; Officers Spencer Dobson and Lyle Storey, who worked in the Jail's control room and to whom Mr. King allegedly complained about his eye problems, without success; and Officer Darrel McCoy, who also allegedly denied Mr. King's medical requests.

**Wrist Injury**

Mr. King was arrested on May 29, 2002, on a parole violation. Before being booked into the Jail he was taken to the Dixie Regional Medical Center for

---

[1] Nurse Patt passed away after the filing of this suit and is now represented by his estate.

evaluation. There, he was seen by Dr. B. Christiansen, who diagnosed him with a broken scaphoid bone in his wrist and gave him a splint to wear. Dr. Christiansen prepared a Prisoner Medical Clearance Report stating that Mr. King should see an orthopedic specialist within 24 to 48 hours.[2]

Notwithstanding Dr. Christiansen's instructions, Mr. King was never taken to see an orthopedist. Instead, on June 6, 2002, he was examined by Cecil Huff, a Registered Nurse and independent contractor who had been hired to treat inmates at the Jail.[3] Mr. King asserts that during his visit with Nurse Huff he complained of his wrist problem. Nurse Huff's examination notes do not reflect such a complaint. But Mr. King asserts that as a result of Nurse Patt's failure, as supervisor of his medical care, to follow Dr. Christiansen's instructions that he be seen by an orthopedic specialist, his wrist did not properly re-set and has healed in the wrong position causing him permanent lack of mobility and pain.

**Detached Retina/Loss of Vision**

In June 2002, while recreating at the Jail, Mr. King was allegedly hit in the right eye by a handball. He alleges that he put in a medical request concerning his

---

[2]  The Medical Center also prepared aftercare instructions informing Mr. King that he should call as soon as possible to make an appointment to be seen by a doctor within 24 hours, and that his doctor would be able to tell him how long he would have to continue wearing the splint. Mr. King asserts that he did not receive a copy of these aftercare instructions until many months later.

[3]  Nurse Huff was originally named as a defendant in this action but the district court dismissed him as part of a screening order.

eye on July 28, 2002, which the defendants never answered. The defendants assert that Mr. King made his first medical request concerning the eye injury on August 2, 2002, when he submitted a medical request form complaining of pain and vision problems in his right eye.

As a result of the August 2 request, Mr. King was examined on August 5, 2002, by Nurse Huff. Nurse Huff noted a total lack of red reflex in Mr. King's right eye and recommended that he see an ophthalmologist. He allegedly communicated this recommendation to Nurse Patt. Medical literature in the record notes that a lack of red reflex is a known indicator of a detached retina or other serious conditions. Such conditions are generally considered an optical emergency warranting prompt referral to an eye specialist.

In the weeks that followed, Mr. King attempted to obtain care for his eye problem. On August 18, 2002, he put in a request to see an eye doctor due to headaches and worsening of his vision. Defendant McCoy denied his request on the grounds that eye exams were allowed only to inmates who had been at the jail for six months or more.

On August 21, 2002, Mr. King put in another medical request, asking to be transported out of the Jail to see an eye doctor on August 23, 2002, between the hours of 1 and 4 p.m. Nurse Patt denied the request, stating that Mr. King would be taken to a specialist at the next available opening. Also on August 21, Mr. King asserts that he complained to defendants Officers Storey and Dobson about headaches,

nausea, dizziness and lack of vision in his right eye. He complains that the officers told him they had contacted medical and that they were told that he would be seen, but he was not.

On August 26, 2002, before Mr. King could be seen by a specialist at the Jail's expense, he was placed in a work release program. This program, known as the Halfway Back Program, is supervised by Adult Probation and Parole.[4] The program required Mr. King to continue to be detained at the Jail when he was not at work. But as a condition of admission to the program, he was required to sign a form stating that he, not the Jail, would be responsible for his medical care while he was in the program.

Two days later, on August 28 and while on work release, Mr. King visited the Doctors' Free Clinic of St. George, Utah, complaining of failing eyesight and headaches. Free Clinic personnel made an emergency appointment for Mr. King to see Dr. Ronald L. Snow, an ophthalmologist, on August 30. On August 29, the director of the Free Clinic, DeAnne Felt, contacted the Jail to confirm Mr. King's appointment. She was told that there would be no problem getting Mr. King to the appointment.

Mr. King failed to appear at his August 30 appointment. He asserts that Jail personnel failed to inform him of the appointment. In an affidavit submitted to the

---

[4] The defendants note that it was the parole division, not the defendants, who approved his placement in the program.

district court, the Jail did not deny that this might have been the case, but it invoked security concerns, noting that "oral messages outside of the Washington County Jail are not delivered to inmates" and that "being on work release, Mr. King was free to contact Ms. Felt or anyone else with respect to his medical needs." Aplt. App., Vol. I at 175 (Declaration of Bart Bailey, Washington County Undersheriff). The defendants did not explain why Mr. King was not transported to his appointment after Jail personnel told Ms. Felt there would be no problem getting him to the appointment.

According to Ms. Felt, after Mr. King failed to appear on August 30 she rescheduled his appointment to September 12, 2002. On that date, Dr. Snow saw Mr. King, diagnosed him with a detached retina, and informed him that due to the delay in treatment he might have permanent vision loss.[5] At that time, Dr. Snow recommended "evaluation and management by a retinal specialist." *Id.* at 314 (Snow treatment notes).[6]

---

[5] In their court-ordered *Martinez* report, the defendants at first asserted that Mr. King failed to show up for his September 12 appointment with Dr. Snow, and chose to be seen at "Dixie's Free Clinic in St. George" [sic] instead. Aplt. App., Vol. I at 122. They later admitted that Mr. King was seen by Dr. Snow. *See id.*, Vol. II at 410.

[6] The defendants tell a very different story about Mr. King's appointments with Dr. Snow. In their appellate statement of facts, they omit any mention of the August 30 appointment and contend that it was Jail personnel who made the September 12 appointment, after Mr. King saw Nurse Huff in August. Defendants also characterize this appointment as being made for Mr. King at the "earliest possible time." Aplt. Opening Br. at 15. Defendants admit that Mr. King was not told of the appointment, however, until he was placed on work release. They contend this was for security

(continued)

- 6 -

Following his appointment with Dr. Snow, Mr. King filed a level one grievance challenging Nurse Patt's medical qualifications and asserting that his decision to delay treatment had caused him permanent injury. After receiving no timely response, Mr. King filed two additional grievances on September 26, 2002, again challenging Nurse Patt's qualifications, complaining about the Jail's failure to notify him of his appointment on August 30, 2002, and asserting that Nurse Patt's decision to delay treatment had caused him permanent injury.[7]

Jail Commander Jon Neighbor reviewed the grievances and informed Mr. King that Mr. King was responsible for "attend[ing] to your medical needs immediately during your work release" but that "we will attend to any and all the [sic] emergency needs of the offenders in our custody regardless of their housing status." *Id.*, Vol. II at 576. He then referred the grievances to Nurse Patt for a response.

Nurse Patt responded to the grievances, stating in pertinent part that "[i]t is unfortunate that you have suffered injury to your eye. You chose to go to the Free Clinic instead of an ophthalmology specialist as directed which contributed to the

_____

reasons, "to prevent escape attempts orchestrated by family, friends or accomplices of the inmate." *Id.* at 16. For summary judgment and qualified immunity purposes, we must credit Mr. King's version of the facts, which we note is corroborated by some documentary evidence.

[7] One of these grievance forms is marked "VOID" and Mr. King apparently had to write around the word "void" to complete the grievance. *See* Aplt. App., Vol. I at 62.

- 7 -

delay in treatment. . . . [W]hile I empathize with your problem, we are not to blame for your outcome." *Id.*, Vol. I at 321 (all-caps style omitted).

In the months that followed, Mr. King received permission and was released to go to other eye appointments while on work release, but he did not keep the appointments. When his probation officer asked why he did not keep the appointments, he stated that he could not afford them.

On October 2, 2002, Mr. King filed a grievance requesting that the Jail pay for his eye treatment. Mr. Neighbor denied the grievance. While acknowledging that Mr. King claimed that his finances prohibited him from seeking the medical care he needed, Mr. Neighbor stated that while on work release, Mr. King was responsible "to pay for that care or seek some other community provider to pay for the same." *Id.* at 202.

On December 19, 2002, Mr. King had an appointment to see a retinal expert in Nevada but he was denied permission to travel out of state. The same day he was released from the Jail for work release but returned late to the Jail, prompting his parole officer to initiate parole revocation proceedings. Mr. King stipulated to the alleged parole violations and consented to being returned to prison where he could receive eye treatment.

Following his return to prison Mr. King received a prompt referral for treatment at the University of Utah Moran Eye Center. On February 28, 2003, nearly seven months after Nurse Huff noted his lack of red reflex, he had an initial

consultation with Dr. Paul Bernstein. Just over a week later Dr. Bernstein performed a very aggressive surgery in an attempt to repair the detached retina. The surgery proved unsuccessful, however, and Mr. King was left essentially blind, with only bare light perception, in his right eye. Dr. Bernstein later opined that an earlier surgery would likely have resulted in a better outcome.

**District Court Decision**

As noted, the district court denied qualified immunity on both of Mr. King's claims. Concerning his broken wrist, the district court ruled that a jury could reasonably conclude that the defendants' willful failure to review and act upon the Medical Clearance Report by obtaining specific follow-up treatment amounted to deliberate indifference. The district court concluded that a genuine issue of material fact existed concerning whether the defendants were aware of and disregarded Mr. King's need for follow-up treatment for his broken wrist.

Concerning Mr. King's eye injury, the district court noted the record did not support defendants' assertion that they were only generally aware of Mr. King's eye problems. There was evidence that Nurse Patt attended the eye exam at which the lack of red reflex was discovered, that he reviewed Nurse Huff's findings, and that he knew of the seriousness of Mr. King's symptoms and the need for prompt follow-up care. The record also raised serious questions concerning the adequacy of defendants' efforts to obtain treatment for Mr. King. The district court further concluded that defendants' actions "lend support to [Mr. King's] argument that work

release was merely a tactic to avoid providing costly medical treatment to [him]." *Id.*, Vol. II at 680.

## DISCUSSION

### 1. Legal Principles

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009).

"This court reviews the denial of qualified immunity on summary judgment de novo." *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003) (internal quotation marks and italics omitted). Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence is viewed, and reasonable inferences are drawn from the evidence, in the light most favorable to the nonmoving party." *Verdecia*, 327 F.3d at 1174. An order denying qualified immunity before trial is appealable "only to the extent that the denial . . . turns on an issue of law." *Price-Cornelison v. Brooks*, 524 F.3d 1103,

1108 (10th Cir. 2008).  Review on interlocutory appeal is not available for "question[s] of 'evidence sufficiency.'"  *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

An Eighth Amendment claim of deliberate indifference to serious medical needs requires the plaintiff to demonstrate "both an objective and a subjective component."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  To satisfy the objective component, "[t]he prisoner must first produce evidence that the deprivation at issue was in fact sufficiently serious."  *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (internal quotation marks omitted).  The subjective component requires "evidence of the prison official's culpable state of mind," which may be fulfilled by showing that the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference."  *Id.* (brackets and internal quotation marks omitted).

### 2.  Factual Disputes

Many of the defendants' appellate challenges involve attacks on the district court's determination that, when viewed in the light most favorable to Mr. King, the evidence sustained his evidentiary burden.  For example, defendants challenge whether there was any evidence that they knew about Mr. King's wrist injury and thus could have been deliberately indifferent to it.  Aplt. Opening Br. at 21, 26.  The district court found that the Medical Clearance Report put them on notice of the

injury. The defendants' argument to the contrary presents a question of evidence sufficiency. We lack jurisdiction over such issues in this interlocutory appeal.

Similarly, defendants argue that the evidence Mr. King presented did not establish sufficient knowledge on their part of his serious eye condition to constitute deliberate indifference. *Id.* at 27-28. The district court rejected this contention, noting that Nurse Patt attended his eye exam with Nurse Huff and reviewed Nurse Huff's findings. Also, Nurse Patt admitted that he was aware of the seriousness of Mr. King's symptoms and of his need for prompt follow-up care. Again, defendants' argument is simply a non-justiciable attack on the sufficiency of the evidence.

Defendants argue that they repeatedly gave Mr. King the opportunity to see an eye specialist, but that he opted not to do so. This contention is also the subject of factual disputes. Genuine issues of material fact remain concerning who made the appointments for Mr. King and whether defendants interfered with or at least failed to facilitate at least one of the appointments he claims he made for himself.

Finally, defendants argue that Mr. King failed to establish that each of them personally participated in the alleged Eighth Amendment violation. A plaintiff alleging a claim for denial of his constitutional rights pursuant to 42 U.S.C. § 1983 must demonstrate that the defendants each were personally involved in the alleged constitutional violation. *Stewart v. Beach*, 701 F.3d 1322, 1328 (10th Cir. 2012). It is true that the district court did not always separately analyze the role of each

individual defendant in each of the incidents described; in its decision, it frequently referred to "the defendants" *en masse*.

Unfortunately for defendants, however, their arguments on this point tend to be too vague and general to present an authentic appellate issue. *See* Aplt. Opening Br. at 25 ("Washington County Defendants respectfully submit that Mr. King has failed to demonstrate how they, everyone [sic] of them, violated his Constitutional rights."). In fact, in denying responsibility for Mr. King's injuries, defendants themselves adopt the district court's approach of referring to themselves *en masse* rather than individually. *Id.* at 22, 25, 26, 27, 30, 31. Their only adequately-developed argument on this point concerns whether Officers Storey and Dobson personally participated in the denial of medical care. The district court implicitly found sufficient personal participation by these officers, *see* Aplt. App., Vol. II at 672, and notwithstanding defendants' subtle re-characterization of the district court's factual findings, *see* Aplt. Opening Br. at 11-12 & n.36,[8] we lack jurisdiction to review the district court's determination of evidentiary sufficiency.

---

[8]     The district court recited that on August 21, 2002,

> Plaintiff complained to the control room officers on duty, Defendants Storey and Dobson, about headaches, nausea, dizziness and lack of vision in his right eye. Plaintiff's declarations state that Storey and Dobson refused to contact medical and instead mocked and teased Plaintiff. In his grievances, however, Plaintiff states that the officers contacted the medical department and were told that Plaintiff would be seen as soon as possible but *apparently they never followed up*.

Aplt. App., Vol. II at 672 (emphasis added).

(continued)

### 3. Legal Issues

Defendants do present two discrete legal issues for our review. First, they argue that the Jail was not legally responsible for payment of Mr. King's medical expenses while he was on work release, or at least that any Eighth Amendment obligation for them to pay was not clearly established. Second, they contend that Mr. King's claims fail as a matter of law because he neglected to present expert medical testimony that any actions or inactions on their part were the proximate cause of his alleged injuries. We now turn to these issues.

### A. Jail's Responsibility for Payment of Medical Expenses

Defendants argue that they had no clearly-established Eighth Amendment obligation to pay for Mr. King's medical care while he was on work release. The district court did not directly resolve the merits of this assertion. Nor do we find it necessary to do so. Instead, the district court characterized defendants' argument as

> unavailing for two reasons. First, it overlooks Plaintiff's claim that failure to provide prompt treatment before granting work release violated the Eighth Amendment. And, second, it ignores the possibility that placing Plaintiff on work release, despite knowledge of an urgent, preexisting condition for which Plaintiff could not obtain care on his own, might itself amount to deliberate indifference.

Aplt. App., Vol. II at 683.

Defendants challenge each of these rationales. First, they note that they did not "place[] [Mr. King] on work release despite knowing of his medical condition."

---

Defendants' version of these events omits the reference to the officers' failure to follow up. Aplt. Br. at 12.

- 14 -

Aplt. Opening Br. at 33. They argue that it was the Utah State Board of Pardons that placed Mr. King on work release, at his request. But defendants' knowledge that plaintiff was potentially scheduled to enter the work release program did not excuse them from attempting to provide him with treatment for his urgent eye problem *before* he was released to the program. *Cf. Ortiz v. City of Chicago*, 656 F.3d 523, 531 (7th Cir. 2011) (stating jailers do not have a license "to deny all arrestees all medical care simply because they will probably be transferred within 48 hours. . . . [A] detainee cannot be treated like a hot potato."). In particular, we note that Mr. King signed the medical release form, making him responsible for his own medical care, on August 8, 2002, a full *eighteen days* before he went on work release.

Defendants also argue that the district court's analysis was erroneous because Mr. King failed to establish that their alleged deliberate indifference prior to his participation in work release caused his vision loss. This contention dovetails with their causation issue, to which we now turn.

## B. Lack of Expert Testimony Concerning Causation[9]

In response to defendants' summary judgment motion, Mr. King submitted two letters from Dr. Bernstein, the surgeon who attempted to save the vision in his right

---

[9] The defendants' causation argument adequately addresses only Mr. King's eye injury, *see* Aplt. Opening Br. at 30-32, and we therefore consider only the showing of causation concerning that injury.

- 15 -

eye.[10] In the first letter, dated June 27, 2003, Dr. Bernstein stated:

> I think it is true that it is likely that you would have had a better outcome had you been seen sooner. We always prefer to repair retinal detachments soon after the first symptoms, because this maximizes the outcome. You[r] retinal detachment had been present for many, many months, and by the time we operated, you had a dense cataract and a very fibrotic retina. As you know, I was unable to repair it, despite my best efforts.

Aplt. App., Vol. II at 521.

> In the second letter, dated May 27, 2004, Dr. Bernstein stated:

> With the original trauma [in June 2002], and flashes of light, these were the first signs and symptoms that something was amiss with your eye. If you had been seen by an eye doctor at that time, it may have been possible to diagnose a retinal tear or a very small retinal detachment, which could have been treated much more easily than the very advanced retinal detachment with which I was confronted when I first saw you in February of 2003. Thus, my opinion is that prompt medical care when you first had your symptoms of flashes and floaters might have led to a much better outcome in your right eye.

*Id.* at 522.

---

[10] In district court, the defendants argued that the letters from Dr. Bernstein should be excluded as impermissible hearsay. In their opening brief in this court, they devote a single sentence in a footnote to this contention. Aplt. Opening Br. at 32 n.86 ("Washington County Defendants objected to the District Court's consideration of Dr. Bernstein's letters as evidence because they were speculation and inadmissible hearsay."). This is insufficient argument to raise an appellate issue concerning the hearsay rule. In particular, it does not put Mr. King on notice of the need to respond in his brief by attempting to assert the inapplicability of, or an exception to, the hearsay rule. We therefore deem any issue about the hearsay nature of Dr. Bernstein's letters to be forfeited for purposes of this appeal, and we will not address it further. *See, e.g.*, *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . .").

Defendants present two arguments concerning Mr. King's alleged failure to establish causation.  First, they argue that Mr. King was obliged to provide expert testimony to establish that their deliberate indifference was the proximate cause of his loss of vision.  Second, they argue that the evidence was insufficient as a matter of law to establish causation.  We reject both arguments.

"Although frequently important in § 1983 actions, expert testimony is normally not indispensable as the law rarely predicates recovery upon expert testimony."  Martin A. Schwartz, *Section 1983 Litigation Federal Evidence* § 6.01[C] (5th ed. 2012) (emphasis and internal quotation marks omitted).  We have located no published authority in this circuit establishing a bright-line rule for when expert medical testimony is required in a prisoner medical-treatment case.  Other circuits have reached divergent results concerning whether and when expert testimony is required.  *Compare, e.g.*, *Ortiz*, 656 F.3d at 535 (citing cases holding that "in delay of medical care cases . . . non-expert evidence is sufficient as long as it permits the fact-finder to determine whether the delay caused additional harm"); *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("We have never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony.  The inquiry remains whether the treating physician or other prison official was deliberately indifferent to a prisoner's serious medical needs, not whether the doctor's conduct is actionable under state malpractice law"), *with* *Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006) ("Where the complaint

involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation.").

We agree with the authorities cited above holding that expert testimony is not required in cases where the jury can determine from the non-expert evidence presented whether the delay caused additional harm. We are unwilling to hold that expert testimony is *never* required in a deliberate-indifference case involving delay of medical care. In some instances, the effects of delay may be so subtle or complex that a lay jury cannot adequately determine the issue of causation without expert assistance. *Cf. McCarthy v. Weinberg*, 753 F.2d 836, 839 (10th Cir. 1985) (noting, in deliberate indifference case, that "[t]he factual, medical issues involved are complex, requiring the presentation of expert opinion" and thus district court should have appointed counsel for plaintiff).

But this is not such a case. The record evidence establishes that loss of red reflex is a sign of an optical emergency requiring immediate referral to a qualified specialist. Genuine issues of material fact remain concerning whether defendants facilitated or hindered Mr. King's attempts to obtain care for his eye problem after he was seen by Nurse Patt. At a minimum, defendants may have failed in their role as "gatekeepers" charged with insuring that Mr. King received prompt and adequate optical care from an appropriate specialist. *See Sealock*, 218 F.3d at 1211 (describing "gatekeeper" role in deliberate-indifference case).

We turn to the defendants' claim that the evidence of causation is insufficient to carry Mr. King's burden. Although defendants raised the causation issue in their motion for summary judgment, the district court did not specifically detail the evidence it concluded was sufficient to establish causation. We may therefore consider de novo in this qualified immunity appeal, the issue of whether a reasonable jury could conclude that the defendants' particular charged conduct caused additional harm to Mr. King's eye. *See Lynch v. Barrett*, 703 F.3d 1153, 1160 n.2 (10th Cir. 2013) (stating district court's decision should "state[] facts tending to establish *each element* of a plaintiff's claim" to avoid exception requiring this court to "look behind a district court's order denying officials qualified immunity at the summary judgment stage." (emphasis added)), *petition for cert. filed* (U.S. Mar. 8, 2013) (No. 12-9207).

Our de novo review of the evidence convinces us that the letters submitted by Dr. Bernstein were sufficient to meet Mr. King's summary-judgment burden on the issue of causation. Dr. Bernstein's statements could permit a reasonable jury "to determine [that] the delay caused additional harm." *Ortiz*, 656 F.3d at 535. Dr. Bernstein opined in his second letter that prompt care at the first sign of symptoms could have led to a better outcome. Contrary to defendants' argument, this opinion concerning the *possibility* of a better outcome qualifies as evidence rather than mere speculation. *See Bass ex rel. Lewis v. Wallenstein*, 769 F.2d 1173, 1184 (7th Cir. 1985) (finding, in jury trial case, that physician's expert testimony that inmate would have had a ten to thirty percent *chance of survival* had prison doctor

responded several minutes sooner than he did to heart attack was not unduly speculative and sufficed to prove causation; noting that "the evidence need not have established that if [the inmate] had been given advanced cardiac life support immediately upon his arrival in the emergency room his chance for survival would have been 100%. The law does not require and medicine cannot provide such exactitude."). We therefore conclude that Mr. King met his summary-judgment burden to establish causation, and the district court properly denied qualified immunity on this ground.

## CONCLUSION

Defendants have failed to show that the district court erred in denying their motion for summary judgment on the basis of qualified immunity. We lack jurisdiction to consider their arguments that challenge the district court's findings concerning the sufficiency of the evidence. We therefore affirm the district court's determination that Mr. King's placement on work release did not insulate defendants from his Eighth Amendment claims, reject defendants' contention that Mr. King's claims fail as a matter of law for lack of expert medical testimony concerning causation, and dismiss the defendants' remaining claims for lack of appellate jurisdiction.

Entered for the Court


William J. Holloway, Jr.
Senior Circuit Judge

- 20 -