In the

# United States Court of Appeals
### For the Seventh Circuit

No. 10-1775

APRIL ORTIZ, as administrator of the
ESTATE OF MAY MOLINA,

*Plaintiff-Appellant*,

*v.*

THE CITY OF CHICAGO, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 7423—**John F. Grady**, *Judge*.

ARGUED FEBRUARY 15, 2011—DECIDED AUGUST 25, 2011

Before ROVNER, WOOD, and EVANS[*], *Circuit Judges*.

WOOD, *Circuit Judge*.  May Molina, a prominent civil
rights activist known for protesting police practices, died

[*] Circuit Judge Evans died on August 10, 2011, and did not
participate in the decision of this case, which is being
resolved by a quorum of the panel under 28 U.S.C. § 46(d).

in custody over 24 hours after officers arrested her on drug charges at her home. Molina was disabled, obese, and in poor health. She took daily medications for several ailments, including diabetes, a thyroid condition, hypertension, and asthma. Pursuant to a Chicago Police Department (CPD) policy that prohibits arrestees from taking medications while in lockup unless they are taken to a hospital, Molina had no access to her medications while in custody. When she met with her lawyer about 16 hours into her detention, she could hardly speak, walk, or stand. He told the lockup keepers to get Molina to a hospital because she was clearly sick. None of the guards on duty responded. Instead, her health deteriorated and she died alone in her cell.

April Ortiz, who is Molina's daughter, is acting as the administrator of Molina's estate. (Appellant's opening brief represents that of the several plaintiffs who appeared in the district court, the only one remaining is the Estate. For convenience we refer to it as Ortiz.) First, Ortiz argues that the district court improperly granted summary judgment on her claim that the defendants, collectively the City of Chicago and the lockup officers, unreasonably denied Molina medical care by not taking her to the hospital so that she could resume her medications. Embedded in this claim is an evidentiary issue, because the court excluded Ortiz's expert witness. Second, Ortiz argues that the district court erred in granting summary judgment for the defendants on her claim that they unconstitutionally held Molina in custody for 27 hours without taking her before a judge for a probable cause hearing. We reverse the district court's grant of

summary judgment on the denial of medical care claim but affirm on the delayed hearing claim.

## I

Because Ortiz appeals from a grant of summary judgment against her, we construe the evidence and reasonable inferences from it in her favor. CPD officers searched Molina's home at 3526 N. Halsted Street pursuant to an uncontested search warrant on May 24, 2004. Officers apparently received a tip from a confidential informant stating that he had purchased small amounts of drugs from Molina and from her son, Michael Ortiz, who lived upstairs. Based on this information, 17 officers raided the two-flat apartments where Molina and her son lived. There they recovered a number of tinfoil packets and some brown putty. Officers later arrested the two, but all charges against Michael Ortiz were eventually dropped.

Molina required constant access to an array of medications to survive. She had Type II diabetes mellitus that required medication (including Glipizide and Metformin) and monitoring to ensure that her blood sugar was controlled. Otherwise, she risked slipping into either a hyperglycemic or hypoglycemic state, which could lead to a fatal coma. She also suffered from life-threatening hypertensive and thyroid conditions, both of which required medication (including Fursosemide, Enalapril, and Potassium Chloride) and monitoring. She used a wheelchair or walker to get around. At the time of her arrest (10:07 p.m. on May 24), Molina informed the

officers that she took thyroid and diabetes medications and asked whether she could bring them along. The officers told her that medications were not permitted in lockup.

Initially, Molina was detained briefly at the 23rd District lockup, which does not have a women's unit. Ortiz brought Molina's medications to that facility, explaining to the officer on duty (who is not a defendant in this lawsuit) that her mother needed the medications "to save her life." The officer refused to accept the medications, stating that Molina would soon be transferred to the 19th District lockup and then taken to Cermak Hospital where she would be provided with medical care.

Molina arrived at the 19th District lockup at 4:25 a.m. on May 25. At that time, Officers Avis Jamison and Authurine Pryor were staffing the 9:30 p.m. to 5:30 a.m. overnight shift. Officer Jamison, in Pryor's presence, interviewed Molina upon arrival to create what the parties call the screening record. She asked if Molina had any "serious medical problems," and Molina responded that she did. Molina described her medical problems to Jamison, who noted on the screening record that Molina was taking medicine for diabetes, thyroid-related issues, and other conditions. Jamison did not inquire further about the type or frequency of Molina's medications. After completing the screening record, Jamison took it to the front desk, where it remained accessible to all front desk personnel. Officer Pryor photographed and finger-printed Molina, and also asked her routine questions about whether she was sick, injured, or in need of medical

assistance. Pryor says that Molina responded that she was fine and did not want to go to the hospital.

During this time, another arrestee, Diane Rice, was detained at the 19th District lockup. She heard Molina yell several times for a doctor and a wheelchair, though exactly when is unclear. Rice recounted that after Molina yelled for a doctor, someone yelled back: "Ma'am, we asked you when you came in if you needed a doctor, and you said no." Rice also asserts that the officers did not conduct the requisite 15-minute cell checks.

After Molina was photographed and fingerprinted, CPD personnel transmitted her prints to the "10-print" unit for verification. Around 5:30 a.m., Officer Pryor observed Molina walk back to her cell after making a phone call. Pryor estimated that it took Molina five to seven minutes to walk a distance of about 30 feet. The next shift began at 5:30 a.m. on May 25, at which point Officers Catherine Ziemba and Tamara Lemon-Richmond took over. During the shift change, Pryor informed Ziemba that Molina had trouble walking and would need a "special needs" car to go to court because she was obese and moving slowly. By about 7:00 a.m., Molina's identity was manually verified and confirmed. CPD personnel then transmitted Molina's information to the "Instant Update Unit," which transferred her arrest history from a typewritten form to a computer database and checked for outstanding warrants. At 12:12 p.m. all administrative tasks that were needed before Molina could be taken to bond court were completed. Neither Ziemba nor Lemon-Richmond

tried to send her to bond court before their shift ended
at 1:30 p.m.

Another shift change took place at 1:30 p.m., at which
point Officers Diane Yost and Beverly Gilchrist took
charge of the lockup until 9:30 p.m. Around 4:00 p.m.,
Molina's long-time attorney, Jerry Bischoff, arrived to
speak with his client. Yost and Gilchrist escorted Molina
to meet with Bischoff. According to Yost, it took Molina
several minutes to walk a few feet, and she had to hold
on to the wall to make any progress. Bischoff's testi-
mony provides the clearest insight into Molina's health
during this time. He said that Molina, whom he had
never seen out of a wheelchair, was "having difficulty
breathing" and "was breathing like someone who had
just . . . run up a flight of stairs." Bischoff further noted
that Molina was groggy, exhausted, and could not stand
up on her own. Upon making these observations,
Bischoff concluded that it would be unproductive to
discuss Molina's case with her at that time and instead
he inquired about her health. He asked if she was
diabetic, and Molina, unable to speak, nodded her head
yes. Bischoff then asked how she took her medication,
and she gestured that she did so orally. When Bischoff
inquired whether she had been able to take her medica-
tions while in lockup, Molina gestured to indicate that
she had not. Bischoff thought that Molina belonged in
the hospital and terminated the meeting. He then told
Yost and Gilchrist that Molina needed to go to Cermak
Hospital because she was "clearly sick." According to
Bischoff, the officers responded, "we are working on

it, counsel." Yost denies being present at that time, and Gilchrist contends that this exchange never occurred.

Officer Maja Ramirez was working at the front desk, where Officer Jamison had previously deposited Molina's screening record, on May 25. During her shift, Ramirez received five to ten calls from a number of different people informing her that Molina needed to take her medications or go see a doctor. Ramirez says she did not recall whether the callers told her about specific medications, nor did she ask any follow-up questions. Instead she told each caller that a request for medication must come from the detainee, not a third party. Ramirez also says that she informed one of her supervisors about the phone calls after receiving the first few. Ramirez did not take any further action, such as walking to the lockup to see if Molina was all right, because that was not her job. The plaintiffs say that the supervisors on duty at the time were Sergeant Debra Holmes and Lieutenant William Wallace. Neither of the supervisors took any responsive action.

Officer Jamison returned to work the 9:30 p.m. to 5:30 a.m. overnight shift on May 25 with Officer Martha Gomez. Jamison is the only officer who had direct contact with Molina on two different shifts. At 11:00 that night, another arrestee, Jasmine Vaccarello, arrived in lockup. Vaccarello says that she heard Molina yell for attention when she first arrived. While Vaccarello was being led to her cell, she heard Molina ask the guards for her medications, a walker, and a telephone call. According to Vaccarello, the officers on duty, Jamison and

Gomez, ignored Molina. While Vaccarello was in her cell, she heard Molina call out for help, but to no avail. At some point, Vaccarello became concerned enough that she called out for help on Molina's behalf, at which point either Jamison or Gomez yelled back: "shut the f--- up!" Vaccarello says that the officers on duty that night did not conduct the required 15-minute cell checks. Finally, Vaccarello explains that she heard what sounded like snoring coming from Molina's cell, but that over time the sound became shallower. Eventually, she could no longer hear Molina at all. At 2:45 a.m. on May 26, Jamison noticed Molina unresponsive in her cell. She had passed away.

A post-mortem examination conducted by the Cook County Medical Examiner, Dr. Eupil Choi, revealed that Molina had ingested six tinfoil packets before her demise. Toxicology reports showed that she had morphine in her blood at the time of death. Based on this information, Dr. Choi concluded that Molina died from opiate intoxication complicated by obesity and cirrhosis of the liver. Ortiz's expert witness, Dr. Adelman, whose testimony the district court excluded on *Daubert* grounds, offered a competing opinion about the deterioration of Molina's health while in custody. Dr. Adelman concluded that the deprivation of her medications for diabetes and thyroid caused Molina to fall into a myxedematous or diabetic coma, which eventually led to her death. Dr. Adelman also stated that even if Molina died of a heroin overdose, which he did not think was the case, she could have survived had she been taken to the hospital for medical care.

**II**

This lawsuit began when Michael Ortiz and another plaintiff sued the City of Chicago and several police officers on November 16, 2004 for § 1983 constitutional and state law claims. On February 23, 2005, an amended complaint added April Ortiz, Molina's daughter, to the lawsuit. Initially, the claims related to the arrest and detention of Michael Ortiz and May Molina, but on appeal our concern is only with Ortiz's federal claims on behalf of her mother's estate, arising from Molina's detention and death. Unfortunately, this lawsuit has taken a long and choppy path. One consequence of this is that Ortiz's medical expert, Dr. Adelman, did not have access to all of the relevant materials until late in the game. That is why, Ortiz says, Dr. Adelman submitted four different versions of his report to the court. Ortiz also asserts that the district court's grant of the defendants' motion for a stay of discovery prevented them from identifying two important witnesses, Rice and Vaccarello, until quite late in the proceedings. Finally, we note that there appears to be an unresolved dispute concerning whether the City of Chicago stipulated to accept liability in this lawsuit if any of the defendants was found to be liable.

Reflecting the staggered development of the case, the district court resolved the two substantive issues Ortiz raises on appeal in two different orders, and it addressed her evidentiary issue in two more orders. Disposing of the plaintiff's ineffective medical care claim on May 13, 2008, the court concluded that only two of the

defendants were sufficiently on notice that Molina was in need of medical care. These defendants, it held, were entitled to summary judgment because the plaintiff failed to put forth enough evidence on the proximate cause of Molina's death. The absence of evidence on proximate causation, as the court acknowledged, stemmed from the court's prior exclusion of the plaintiff's expert witness in an order dated October 7, 2007. The court concluded that Ortiz had failed to remedy the weaknesses in Dr. Adelman's testimony by the time of summary judgment. On February 18, 2010, the court granted summary judgment for the two defendants named in conjunction with the plaintiff's *Gerstein* claim, concluding that they were not responsible for any delay in getting Molina to a bond hearing. We consider first the medical care claim, including the evidentiary point, and then the hearing claim.

## III

### A

The court rejected Ortiz's claim that Molina received constitutionally inadequate medical care in its order of May 13, 2008. Our review is *de novo*, and we construe all facts and reasonable inferences in the light most favorable to Ortiz, the nonmoving party. *Stokes v. Bd. of Educ.*, 599 F.3d 617, 619 (7th Cir. 2010). Before delving into the facts, the court determined that the Fourth Amendment's reasonableness standard governs this inquiry, rather than the deliberate indifference standard derived from the Eighth Amendment and applied to claims from de-

tainees awaiting a trial by virtue of the Due Process Clause. Because Molina had not yet benefitted from a judicial determination of probable cause, otherwise known as a *Gerstein* hearing, we agree that the Fourth Amendment applies. See *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

Four factors inform our determination of whether an officer's response to Molina's medical needs was objectively unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns. *Williams*, 509 F.3d at 403. Ortiz must also show that the defendants' conduct caused the harm of which she complains. See *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The district court properly narrowed the analysis by concluding that third and fourth factors are off the table in this case because the defendants do not assert that taking Molina to the hospital would have been burdensome or compromised any police interests. Our focus therefore is on whether each individual defendant was on notice of Molina's condition, the seriousness of her medical needs, and whether their failure to act caused her harm. As we

explained in *Williams*, "[t]he severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendments. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." 509 F.3d at 403.

The defendants do not dispute that the *Williams* framework should guide our analysis, but they urge us to focus primarily on another consideration. In light of the inquiry we have just described, the defendants contend that the conduct of the officers should be viewed in light of the "short detention period" that usually spans the time between arrest and the bond hearing. Since the detention period should not generally exceed 48 hours, see *County of Riverside v. McLaughlin,* 500 U.S. 44, 56 (1991), they contend that lockup keepers should not be required to whisk arrestees off to the hospital every time there is a complaint. We agree with the defendants that the relatively short period of time that a detainee spends in lockup is pertinent to the analysis. Some medical procedures are urgent, but many are not time-sensitive within a reasonable period. This general proposition, however, is not a license for lockup keepers to deny all arrestees all medical care simply because they will probably be transferred within 48 hours. To the contrary, "when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume some responsibility for [her] safety and general well-being."

See *DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.*, 489 U.S. 189, 199-200 (1989). Each state actor who encounters a detainee must reasonably respond to medical complaints; a detainee cannot be treated like a hot potato, to be passed along as quickly as possible to the next holder.

The duty to respond reasonably to an arrestee's medical needs is affected by any police policies that may endanger the well-being of those in custody. Here, the CPD's policy of prohibiting detainees from taking medication in lockup unless the individual is transported to Cermak Hospital is central to our inquiry. We have no occasion to comment on whether that policy is wise as a general matter, but its existence cannot be ignored. When a state actor detains a known diabetic in a facility that separates her from the drugs that keep her alive, it must take her medical needs into account in deciding what justifies a trip to the hospital. Presumably, at least part of the function served by creating a screening record for each detainee upon arrival is to gain the information about her health status that is needed to ensure that she remains safe while in custody. In short, in cases like this we must consider everything that each officer knew about Molina's deteriorating health in light of the amount of time she was in custody and the CPD's policy that detainees could not obtain any medication unless they were sent to the hospital.

With these principles in mind, we examine whether the conduct of each defendant was objectively reasonable under the circumstances. As our discussion of the facts indicates, each of them had some notice that Molina's

health was bad. The question on summary judgment is whether a jury could find that it was objectively unreasonable for each defendant to take no action to seek medical care for Molina based on what she knew at the time. We will evaluate the case against each officer in the order that she encountered Molina.

The evidence against Jamison, who worked two 9:30 p.m. to 5:30 a.m. shifts, first on the night Molina was booked and then on the night she died, consists of the following: (1) She created Molina's screening record, making note of the fact that Molina suffered from and took medications for various serious medical conditions, including diabetes; (2) According to Rice, Molina yelled out a request for a doctor after she was placed in her cell while Jamison was on duty; (3) Molina was still in custody on May 26, when Jamison began her shift that day, and Jamison knew Molina had not yet been taken to her bond hearing (and thus could infer that, because Molina had never left the lockup, she had not had access to any of her medications); and (4) On the night of May 26, according to Vaccarello, Molina again yelled for help and asked for her medications.

The defendants respond by attacking the credibility of Rice and Vaccarello, who were in lockup with Molina. But none of their arguments undercuts the value of this testimony at summary judgment, where we resolve all disputed facts and make all reasonable inference in favor of the plaintiff and do not weigh the credibility of witnesses. We decline the defendants' invitation to disregard Rice's and Vaccarello's statements. We acknowl-

edge that Jamison and Pryor assert that Molina said she did not need to go to the hospital when she first arrived. But a jury would not be required to believe this account, particularly since Molina's death precludes her from testifying on her own behalf. See *Cobige v. City of Chicago, Ill.*, 2011 WL 2708756, at *2 (7th Cir. July 12, 2011). Rice's testimony, if credited by a jury, establishes that Molina requested a doctor shortly after she was booked, and Vaccarello's testimony establishes that she called out for her medications shortly before she died. Based on the evidence in the record, a jury could conclude that Jamison was on notice that Molina was suffering from a serious medical condition that required attention. See *Egebergh v. Nicholson*, 272 F.3d 925, 927-28 (7th Cir. 2001).

Officer Pryor, like Jamison, first encountered Molina in the early morning hours of May 25. The evidence against her is a subset of the evidence against Jamison—Pryor asked Molina about her health when she first arrived, observed her condition at the time, was present when Jamison interviewed Molina to create her screening record, and was present when (according to Rice) Molina called out for a doctor. For largely the same reasons that apply to Jamison, we think that a reasonable jury could infer from this evidence that Pryor was on notice that Molina was suffering from a serious medical condition that required attention. When an officer knows that an arrestee has an array of medical conditions as serious as Molina's, a call for help from the arrestee asking to see a doctor is sufficient to create notice of a serious medical need. Thus, we

hold that there is a genuine issue of fact with respect to Jamison's and Pryor's notice of Molina's need for prompt medical attention. A jury could thus find that their failure to get Molina to the hospital was unreasonable.

We need not linger too long on whether Officers Yost and Gilchrist, who staffed the following shift from 1:30 p.m. to 9:30 p.m. on May 25, were on notice that Molina needed help. They were on duty when Bischoff, Molina's attorney, met with her that afternoon. Bischoff says that he directly told them that Molina was "clearly sick" and needed to be taken to the hospital. Given that (according to Bischoff) Molina was unable to speak at the time, we cannot imagine more direct notice that she needed medical care. Yost's assertion that she was not present when Bischoff spoke to Gilchrist, and Gilchrist's denial that Bischoff ever made that statement, are immaterial to our present inquiry. We of course resolve these disputed facts in Ortiz's favor.

Although the district court ultimately concluded that Yost and Gilchrist were on notice, the court appeared to doubt the import of Bischoff's testimony because "it is unclear whether Ms. Molina's problems observed by Mr. Bischoff . . . were symptomatic of diabetes or a thyroid condition." But whether Bischoff or anyone else knew precisely what was the root cause of Molina's physical distress is not at issue here. Lockup keepers are not medical professionals; neither are attorneys or other detainees who happen to observe an arrestee in jail. The question is not whether a particular defendant

knew what was wrong with Molina, but rather whether the defendant, based on what she observed herself and learned from others, should reasonably have known that Molina needed medical care. We therefore reject the defendants' assertion that Yost and Gilchrist should be excused because they could not have known why Bischoff thought that Molina needed to be hospitalized. We conclude that there is triable issue as to whether they were on notice that Molina needed medical care.

We turn next to Ortiz's related claims against Ramirez, Wallace, and Holmes. The claim against Ramirez arises solely from the fact that while she worked the front desk on May 25, she received five to ten calls stating that Molina needed either her medication or a doctor. The defendants say that this alone is insufficient to put Ramirez on notice that Molina needed medical care because Ramirez could not have known who was calling or if the caller was lying about Molina's need for medication. And, they assert, Ramirez herself did not have the authority to dispense medication to Molina or personally to take her to the hospital. All she could do was notify her supervisors, which she did.

The contention that the calls did not put Ramirez on notice that Molina needed her medication because the caller could have been lying is nonsensical. That explanation may shed light on why Ramirez failed to act once she was on notice—because she thought the caller was lying—but it does not refute the receipt of notice. Was it reasonable to do nothing aside from notifying her supervisors after receiving the calls? That, in our view, is

the very question that the jury should decide. So we conclude that there is a triable issue as to whether Ramirez was on notice that Molina needed medical care. For the same reason, we conclude that Ramirez's supervisors, Wallace and Holmes, were also on notice. We recognize that the defendants now contend, for the first time, that Ramirez worked during the daytime, not the evening, and so she could not have informed supervisors Wallace and Holmes (who apparently worked nights) about the phone calls. Evidence on this issue is not part of the record. To the contrary, the district court was under the impression that Ramirez worked during the evening, supporting the plaintiff's narrative of the sequence of events. The parties should resolve this issue on remand.

Finally, we turn to Officer Gomez, who with Jamison worked the shift beginning at 9:30 p.m. on the night that Molina died. As discussed above, the testimony of Vaccarello, the detainee housed in the cell next to Molina's that last night, provides the best evidence that the officers working that shift were on notice that she needed medical care. Indeed, the district court concluded that Vaccarello's testimony creates a triable issue with regard to the officers on duty at the time, but the court appears erroneously to have believed that Yost and Gilchrist, not Jamison and Gomez, were on duty then. The defendants contend that Gomez never saw Molina awake or spoke to her, and so she could not have known that Molina needed any medical care. Without Vaccarello's testimony, that may have been undisputed. But in light of Vaccarello's statement that Molina called

out for her medications, we conclude that Gomez too was on notice that Molina needed medical attention.

Thus, we conclude that defendants Jamison, Pryor, Yost, Gilchrist, Ramirez, Wallace, Holmes, and Gomez had sufficient notice that Molina needed medical care to treat a serious medical condition. This, combined with the fact that it would not have been difficult to transport Molina to the hospital and no police interests stood in the way of that treatment, leads us to conclude that Ortiz has put forth enough facts to survive summary judgment. Certainly, the evidence is of varying strength against each defendant, but at this stage we do not weigh the proof, make credibility determinations, or resolve narrative disputes. Those tasks are left for the trier of fact.

B

We must, however, resolve another issue before any of these defendants can be compelled to face a jury. Ortiz must present evidence sufficient to permit a jury to infer that the defendants' failure to act was a source of harm for Molina. The district court initially framed the causation inquiry as follows: "whether the admissible evidence does create a genuine issue as to whether, had [the defendants] done what they should have done in light of what they observed about May Molina, and seen to it that she was taken to a hospital where she could have been diagnosed and treated, she would not have died or have experienced pain and suffering prior to her death." This is the proper issue for analysis, but it

is not the one that the court pursued. Instead, it looked at a much narrower issue: whether the plaintiff could prove that the failure of the defendants to provide Molina with access to her medications proximately caused her death. With the issue thus framed, the court focused its attention on the plaintiff's expert witness, Dr. Adelman. After excluding Dr. Adelman's testimony under Federal Rule of Evidence 702, the court concluded that the plaintiff's case necessarily failed on the issue of causation. We think the district court misunderstood the proximate cause inquiry and, relatedly, abused its discretion in excluding Dr. Adelman's testimony. We also conclude it was an error for the court to disregard the testimony of Ortiz's second expert, Dr. Joye M. Carter.

*Gayton v. McCoy* illustrates how the district court should have conducted the proximate causation analysis. 593 F.3d at 624-25. There, the detainee entered county jail complaining of chest pain. The defendants knew that the detainee suffered from a serious heart condition and high blood pressure, but she was not provided with any medication or examined by a doctor. While in custody, she began suffering from heroin withdrawal and vomited violently. Soon after, she died. The district court decided that the plaintiff needed to show, through expert testimony, that the defendant's inaction caused the detainee's death. *Id*. at 624. After excluding the plaintiff's expert under Rule 702, the court granted summary judgment for the defendants. We reversed, explaining that "even if the plaintiff could not proffer expert testimony," she still had "adequate causation evidence" to get the case to trial. *Id*. We emphasized that "[p]roximate

cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation." *Id*.

With the proper causation inquiry identified, it becomes apparent that expert medical testimony establishing the cause of death is not required in this kind of case at summary judgment. Where an obviously ill detainee dies in custody and the defendants' failure to provide medical care is challenged, the causation inquiry is quite broad: "the constitutional violation in question here is the failure to provide adequate medical care [] in response to a serious medical condition, not 'causing her death.' " *Id*. at 619; see also *Egebergh*, 272 F.3d at 928 (reversing summary judgment because a jury could infer that depriving arrestee of one insulin shot exposed him to substantial danger). Here, a jury could infer, based on medical records and witness testimony, that the defendants caused Molina harm when they failed to take her to the hospital after they knew she suffered from a serious medical condition.

To avoid this result, the defendants cite *Myers v. Illinois Central R.R. Co.*, 629 F.3d 639 (7th Cir. 2010), for the proposition that expert testimony is necessary to establish causation. *Myers* was a Federal Employment Liabilities Act (FELA) case that stated it is the norm for a plaintiff to provide expert testimony to establish "specific causation" for "cumulative trauma disorders." *Id.* at 642 (discussing the debate over how plaintiffs must establish

causation under FELA). That general FELA rule is of no help to these defendants, because Ortiz is not required to show "specific causation" for a particular result; she needs only to establish that the failure to take Molina to the hospital was unreasonable under the circumstances and that it caused her some harm. The defendants also argue that, to the extent that the plaintiff claims that Molina was harmed by a delay in medical care, she must produce "verifying medical evidence." True, in *Langston v. Peters*, we said that in delay of medical care cases, a plaintiff must produce "verifying medical evidence." 100 F.3d 1235, 1240-41 (7th Cir. 1996). Yet although expert testimony satisfies this requirement, non-expert evidence is sufficient as long as it permits the fact-finder to determine whether the delay caused additional harm. See *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007); see also *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (holding that absent expert testimony, a jury could infer that the defendant's delay in providing care caused the plaintiff "many more hours of needless suffering for no reason."). In any event, this is not a delay-of-medical-care case, since Molina died before receiving any care. Moreover, even if only a delay in providing medical care were at issue here, there is enough non-expert verifying medical evidence in this record to survive summary judgment.

All that said, the district court was nevertheless mistaken to exclude Dr. Adelman's testimony and to disregard that of Dr. Carter. Though the plaintiff does not need the expert testimony to survive summary judgment, the testimony remains important to the force of

her case. On one level, how (if at all) the defendants' failure to act ultimately caused Molina harm is an inquiry that would benefit from the input of experts. But lurking just below the surface of this question is the mystery of what actually caused Molina's death: a heroin overdose from small packages of drugs she allegedly swallowed just before she was arrested, or the deprivation of her life-saving medications? Ortiz argues that Dr. Adelman's testimony should be admitted in support of her argument that the defendants' inaction caused Molina's death, in addition to needless pain and suffering. We assume that at trial, the defendants will support their theory of a heroin overdose.

Under Rule 702, expert testimony is admissible if (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. FED. R. OF EVID. 702; *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993). The district court has significant latitude in determining how to measure the reliability of the proposed expert and whether the testimony is in fact reliable. *Gayton*, 593 F.3d at 616. Still, the court must provide "more than just conclusory statements" about admissibility to show that it properly performed its gatekeeping function. *Id*. The admissibility determination is not intended to supplant the adversarial process, and so even "shaky" testimony may be admissible. *Id*.

In his January 2, 2008, report, Dr. Adelman said that it was his opinion, "to a reasonable degree of medical

probability, that Ms. Molina, deprived of her diabetic and thyroid medications, fell into a comatose state, most likely a diabetic coma or myxedematous coma, and died. Had she been brought to a hospital even as late as when her lawyer visited with her, the outcome would, to a high degree of medical probability, been much different." Dr. Adelman, therefore, disagreed with the medical examiner's conclusion that Molina died of a narcotic overdose. Nevertheless, Dr. Adelman also opined that even if she had overdosed, death could have been averted if she had been taken to the hospital.

The district court identified three key problems with Dr. Adelman's testimony: (1) his failure to consult Molina's medical records or her treating physician; (2) his failure to discuss the prescribed dosages of her medicine; and (3) his "speculative" conclusions. In the end, the district court concluded that Dr. Adelman's testimony was not based on sufficient data, and, citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), the court said that "there is simply too great an analytical gap between the data and the opinion proffered." We point out that the court did not conclude that Dr. Adelman was unqualified to provide expert testimony on the effect of depriving Molina of her medicine. Indeed, the court noted that Dr. Adelman could have acquired the relevant data from Molina's treating physician to make his testimony more reliable. *Cf. Gayton*, 593 F.3d at 618-19 (finding expert unqualified to testify about effect of cardiac medications for inmate's congenital heart failure because he lacked training in cardiology or pharmacology, but qualified to testify whether vomiting and diuretic

medications contributed to her illness and subsequent death).

Our review of the record shows that the district court was mistaken about the data on which Dr. Adelman relied. Part of the problem may be that, because of the defendants' foot-dragging approach to discovery, Dr. Adelman found it necessary to submit at least four different reports over a three-year period, developing his analysis as he had access to more data. Dr. Adelman's final report, dated January 2, 2008, does not list everything he consulted to make his findings, but the previous reports do. His August 20, 2005, report relied on a long list of Molina's medical and legal records, including: (1) Norwegian Hospital medical records of May Molina for December 29, 2003, admission (about five months before her arrest); (2) medication list; (3) autopsy report and photos; (4) toxicology report; (5) deposition of Dr. Choi, Chief Medical Examiner; (6) CPD arrestee history and supplementary reports; and (7) legal documents, including complaint and search warrant. By the time Dr. Adelman submitted his March 6, 2007, report, Ortiz had collected more information from the defendants about the night of Molina's death, including the names of several witnesses who saw Molina while in lockup. And for the January 2, 2008, report, Dr. Adelman had reviewed more information about Molina's prescribed medications. In particular, Dr. Adelman listed and discussed the following medications prescribed to Molina: Glipizide, 10 mg; Metformin, 1,000 mg; Furosemide, 80 mg; Potassium Chloride, 20 mEq; Albuterol inhaler; Enalapril, 5 mg; and Ibuprofen, 800 mg.

Based on this information, it is plain that the district court's central reason for excluding Dr. Adelman's testimony—that his opinion was based on insufficient data—was founded on an erroneous understanding of the factual record. This alone constitutes an abuse of discretion requiring reversal. See *Musser v. Gentiva Health Serv.*, 356 F.3d 751, 755 (7th Cir. 2004) (a district court's decision to exclude evidence based on clearly erroneous factual findings is an abuse of discretion). We briefly address the district court's other concerns to simplify proceedings on remand. First, Dr. Adelman's supposed failure to consult with Molina's treating physician is something that would go only to the weight, not to the admissibility, of his opinion. In fact, it is not evident that Molina had a primary care physician at the time. More importantly, once we take full stock of the material Dr. Adelman considered in developing his expert opinion, we do not see what additional information he could have discovered from speaking to a primary care physician that he did not already have before him. This is especially true since Dr. Adelman examined the records from Molina's hospital visit only five months before her arrest. Second, we do not see why the district court was so concerned that Dr. Adelman failed to discuss how often Molina took each of her prescribed medications. Molina was deprived of all medication for over 24 hours. Dr. Adelman's opinion is that this was too long, and that this degree of deprivation caused her harm and ultimately her death. Under these circumstances, we cannot agree that Dr. Adelman's failure to discuss how often Molina took each medication is dispositive of whether his expert opinion is reliable.

As in *Gayton*, Dr. Adelman's expert opinion was derived from examining a "cold record," including an autopsy report, medical records, and the testimony of prison guards and other witnesses. 593 F.3d at 618. His opinion explaining what he believes happened to Molina in the final hours of her life need not conclusively and indisputably attest to the cause of her death. See *id.* at 619 ("As we have held on many occasions, an expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome."). The district court's concern that Dr. Adelman's testimony did no more than provide "a series of hypotheses about what could have happened" is misplaced. See *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000). Similarly, the defendants' assertion that Dr. Adelman's ultimate conclusions are incorrect should be redirected toward the jury. We conclude that the court should have accepted Dr. Adelman as an expert witness.

We can be brief with the court's rejection of Dr. Carter. Dr. Carter's testimony was limited to whether, assuming that she died of a heroin overdose, Molina would have suffered less if she had been taken to the hospital. The defendants assert that the court decided not to consider Dr. Carter's testimony because it was untimely, but once again the record does not support that assertion. As with other aspects of this case, the choppy nature of the proceedings seems to have generated more than a little confusion. The record shows that the court gave the parties until January 8, 2008, to name additional experts. Dr. Carter's report is dated January 5, 2008, comfortably

within that deadline. Ortiz appears to have submitted the final report of Dr. Adelman along with Dr. Carter's report, but the court considered only Dr. Adelman's testimony. On top of all that, the defendants have not shown us any ruling of the district court excluding Dr. Carter as untimely. They merely hypothesize about why the court failed to mention her. We are not persuaded by this conjecture; on remand, the court should evaluate the admissibility of Dr. Carter's testimony in light of the principles we have outlined in this opinion. To minimize confusion in future proceedings, we reiterate that the proper question is whether Dr. Carter's testimony could help the jury understand whether the defendants' failure to take Molina to the hospital exacerbated her injury. It is not necessary, although it would be permissible, for her to testify about the precise cause of Molina's death. See *Cobige*, 2011 WL 2708756, at *2 (holding that medical expert's testimony was admissible on whether someone with the decedent's symptoms should have been taken to the hospital).

C

In light of our decision to reverse the grant of summary judgment in favor of the seven defendants mentioned above, we must address the defendants' qualified immunity defense. They argue that the uncertainty over whether the "deliberate indifference" or "objectively unreasonable" standard governs the medical care claim entitles them to qualified immunity. They argue that until 2007, when we decided *Williams v. Rodriguez*, 509 F.3d

392 (7th Cir. 2007), and *Sides v. City of Champaign*, 496 F.3d 820 (7th Cir. 2007), no decision had applied the Fourth Amendment to analyze the reasonableness of the provision of medical care to arrestees. While that may be true, we have long held that the Fourth Amendment protects a person's rights until she has had a probable cause hearing. See *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("There is, to be sure, a difference between the constitutional provisions that apply to the period of confinement before and after a probable cause hearing: the Fourth Amendment governs the former and the Due Process Clause the latter."); *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) (same). The multifactor test announced in *Sides* and clarified in *Williams* was unannounced at the time of Molina's death, yet it was quite clear that the Fourth Amendment applied to her stage of the criminal process.

But even if we were to assume that the standard we have applied in this case was not clearly established at the time Molina died, the outcome of this case would be unaffected. To survive summary judgment, Ortiz would then be required to satisfy the more stringent deliberate indifference standard. This, however, is not a case that turns on the difference between the two standards. Ortiz's argument, if credited by a jury, satisfies the deliberate indifference standard because she argues that defendants were subjectively aware that Molina had a serious medical condition that needed care and they failed to respond adequately. See *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). The defendants do not argue that Molina did not suffer from an objectively serious medical condition. The question is only whether the

officers' failure to act was not only negligent, but deliber-
ately indifferent. Yet it is well settled that providing no
medical care in the face of a serious health risk constitutes
deliberate indifference. See *Walker v. Benjamin*, 293 F.3d
1030, 1037 (7th Cir. 2002). This is not a case where
prison officials provided substandard medical care and
we must decide whether they crossed the line from
medical malpractice (negligence) to deliberate indif-
ference (recklessness). Ortiz's claim is that each of the
defendants knew that Molina suffered from a serious
medical condition, yet they failed to take any step in
response. At this stage, she has done enough to defeat
summary judgment even if the higher standard applied.
We therefore conclude that the defendants are not
entitled to qualified immunity on this claim.

## IV

Finally, we address Ortiz's *Gerstein* claim. A person
arrested without a warrant is entitled to a timely "judicial
determination of probable cause as a prerequisite to
extended restraint of liberty following arrest." *Gerstein v.
Pugh*, 420 U.S. 103, 114 (1975). In *County of Riverside*, 500
U.S. at 56-57, the Supreme Court adopted a burden-shifting
approach using 48 hours as its benchmark. Detentions
over 48 hours are presumptively unreasonable and the
state bears the burden of proving that specific circum-
stances justified the delay, while the plaintiff bears the
burden of showing any detention under 48 hours is
unreasonable. See *Portis v. City of Chicago*, 613 F.3d 702,
704 (7th Cir. 2010).

Ortiz argues that Molina's identity and fingerprints were verified by 7:01 a.m. on May 25, and it was unreasonable for Officers Ziemba and Lemon-Richmond not to present her to a judge that day. The defendants assert that it took about five additional hours to complete administrative tasks—in this case updating her "rap sheet" from a paper file to a computer—and so Molina was not cleared for a probable cause hearing until 12:12 p.m. After that, according to the defendants, it was not possible to take her to court because an arrestee needs to be at Criminal Court by 10:30 a.m. for a probable cause hearing. The plaintiff responds that there was a 1:30 p.m. bond call available and that it would have been possible to get Molina to court even later.

The district court granted summary judgment in favor of Ziemba and Lemon-Richmond on this claim, finding that neither of them was personally liable for the delay. Both of them worked the 5:30 a.m. to 1:30 p.m. shift on May 25, and they do not dispute that it was their duty to get arrestees "going to court" once they were cleared for their appearance. But the record shows that Molina was not cleared for court until 12:12 p.m., leaving only slightly more than an hour for the two officers to get Molina on her way to court before their shift ended (assuming, favorably to Molina, that there was a 1:30 p.m. bond call). Since a delay of one hour did not appear unreasonable to the court, it absolved Ziemba and Lemon-Richmond of all liability.

We agree with the district court that Ortiz has not identified enough facts to establish individual liability of

Ziemba and Lemon-Richmond on this claim. "To establish personal liability in a section 1983 action, the plaintiff must show that the officer 'caused the deprivation of a federal right.'" *Luck*, 138 F.3d at 327 (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). With respect to Ortiz's first claim that Molina's rights were violated because the defendants opted to update Molina's criminal history into a computer database from her printed rap sheet (causing the delay from 7:01 a.m. to 12:12 p.m.), Ortiz fails to explain what role—if any—Ziemba and Lemon-Richmond had with this task. Indeed, the record indicates that these administrative steps were undertaken not by these two defendants, but by someone else. We thus agree with the district court that Ziemba and Lemon-Richmond are not liable based on that theory. We express no opinion on whether it was reasonable for the CPD to take this administrative step before presenting Molina to a judge for a probable cause hearing.

That leaves Ziemba and Lemon-Richmond on the hook for only the period between 12:12 p.m. when Molina was cleared for bond court and 1:30 p.m. when their shift ended. Even if we assume that there was a 1:30 p.m. bond hearing that Molina could have attended, her claim fails. It is the plaintiff's burden to rebut the presumption of reasonableness for a detention that lasts less than 48 hours, and Ortiz has not done so. See *Portis*, 613 F.3d at 704 (observing that arrestees in Chicago are not required to be taken before a judge within 12 hours just because the city operates 24-hour courts). Moreover, it is well known that the "Fourth Amendment does not compel

an immediate determination of probable cause upon completing the administrative steps incident to arrest." *County of Riverside*, 500 U.S. at 53-54. We note, finally, that though Ortiz makes some references to the City's policy of completing unnecessary administrative tasks before sending an individual to a probable cause hearing, she has not pleaded or argued on appeal an independent claim based on an "official policy" of the City of Chicago. See *Luck*, 138 F.3d at 325-26 (explaining actions against municipalities).

For these reasons, we AFFIRM the district court's grant of summary judgment for defendants Ziemba and Lemon-Richmond. We REVERSE the grant of summary judgment for defendants Jamison, Pryor, Yost, Gilchrist, Ramirez, Wallace, Holmes, and Gomez and REMAND for further proceedings consistent with this opinion. We also instruct the district court to determine whether the parties have entered into a valid stipulation regarding the City's acceptance of liability if any of the defendants are found liable to Ortiz.