In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 12-2709

JACLYN CURRIE, as personal representative,
Administrator for the Estate and on behalf
of the Heirs of PHILLIP OKORO,

*Plaintiff-Appellee,*

*v.*

JOGENDRA CHHABRA, *et al.,*

*Defendants-Appellants.*

———————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 09-cv-866-MJR — **Michael J. Reagan**, *Judge.*

———————

ARGUED MAY 29, 2013 — DECIDED AUGUST 20, 2013

———————

Before BAUER, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Phillip Okoro spent the last 69 days of his short life—which ended two days before Christmas, on December 23, 2008, at age 23—in a Williamson County, Illinois jail cell. An autopsy determined that his death resulted from diabetic ketoacidosis, a life-threatening condition associated with untreated Type I diabetes. Jaclyn

Currie, Okoro's sister and the administrator of his estate, brought suit in federal court, alleging violations of Okoro's federal constitutional rights and state law. Two of the named defendants, Dr. Jogendra Chhabra and Nurse Marilyn Ann Reynolds, were employees of a private company (Health Professionals, Ltd.) under contract to provide medical services to the county's inmates at the time of Okoro's death. Shortly before trial, Chhabra and Reynolds filed a motion to dismiss Currie's complaint, asserting qualified immunity on Currie's Fourth Amendment claims. The district court denied the motion, and Chhabra and Reynolds filed this interlocutory appeal. We affirm.

**I**

Okoro was arrested without a warrant at his residence on October 15, 2008, on suspicion of having committed a misdemeanor property crime. The Fourth Amendment "requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest," usually within 48 hours. See *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991) (discussing *Gerstein v. Pugh*, 420 U.S. 103 (1975)). For unknown reasons, Okoro never received such a "*Gerstein* hearing" during his two months of incarceration.

Williamson County contracts with Health Professionals, Ltd. to provide medical care for arrestees and inmates held at the county jail. As a teenager, Okoro was diagnosed with Type I diabetes, which he was able to control with careful monitoring of his blood sugar levels. But his problems worsened while he was in college, when he was diagnosed with schizophrenia. The latter disease compromised his ability to monitor and care for his diabetes. Immediately

after his arrest, Okoro's family members began calling the Williamson County jail to inform correctional employees and medical staff of Okoro's mental illness and diabetic condition. According to the complaint, during his time at the jail Okoro was under the care of Dr. Chhabra and Nurse Reynolds. For the most part, he was detained in his cell, usually in isolation, and thus he was dependent on jail employees and medical staff to monitor his blood sugar level, provide insulin shots, and deliver other necessary medical care.

On December 23, 2008, Okoro collapsed in his cell; he was pronounced dead at the Heartland Regional Medical Center. An autopsy revealed that Okoro's death was the result of diabetic ketoacidosis, a buildup of acidic ketones in the bloodstream that occurs when the body runs out of insulin. See Mayo Clinic Staff, *Diabetic Ketoacidosis*, http://www. mayoclinic.com/health/diabetic-ketoacidosis/DS00674 (last visited Aug. 20, 2013). Currie's complaint alleges that Okoro's death was "completely preventable" and would not have occurred had Okoro received adequate medical care, including regular testing of his blood sugar levels and sufficient insulin to keep his blood sugar level steady.

Currie filed her initial complaint on October 14, 2009, naming as defendants various jail officials, Williamson County, Chhabra and Reynolds, and Health Professionals, Ltd. The initial iterations of her complaint alleged that the defendants acted with "deliberate indifference" to Okoro's medical needs, suggesting a claim that the defendants violated Okoro's due process rights under the Fourteenth Amendment. See *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) ("The Eighth Amendment does not apply to

pretrial detainees, but as a pretrial detainee, [Plaintiff] was entitled to at least the same protection [under the Due Process Clause] against deliberate indifference to his basic needs as is available to convicted prisoners under the Eighth Amendment."). At the close of discovery, however, in response to the defendants' motion for summary judgment, Currie argued for the first time that the Fourth Amendment's "objectively unreasonable" standard should govern. See *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) ("[C]onditions of confinement for pretrial detainees … who have not yet had a judicial determination of probable cause (a *Gerstein* hearing) are … governed by the Fourth Amendment and its objectively unreasonable standard."). The court accepted this argument, ordered Currie to file an amended complaint to reflect this theory, and dismissed without prejudice Currie's previous complaint. See FED. R. CIV. P. 16(c)(2)(B); 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1525 (3d ed. 2012).

Hours after this ruling, Currie settled with the jail officials and Williamson County, leaving Chhabra, Reynolds, and Health Professionals, Ltd. as the sole remaining defendants. Upon receipt of Currie's revised complaint alleging "objectively unreasonable" conduct, Chhabra, Reynolds, and Health Professionals filed a motion to dismiss, asserting qualified immunity "because the Fourth Amendment has not been applied to licensed medical professional[s] subcontracted to care for state detainees." The court denied this motion. Only Chhabra and Reynolds are before us on appeal.

**II**

Before turning to the heart of the appeal, we must address Currie's argument that this court "lacks jurisdiction" to hear Chhabra and Reynolds's interlocutory appeal because their motion to dismiss "was procedurally improper." Currie maintains that Chhabra and Reynolds should have asserted qualified immunity promptly when the district court ruled that it would use a Fourth Amendment framework to assess Currie's constitutional claims. Instead, they waited to receive Currie's amended complaint. The district court wasted little ink rejecting this argument as "disingenuous," explaining that it was not until Currie filed her final amended complaint (which, for the first time, alleged that the defendants' conduct was "objectively unreasonable") that her pleadings "reasonably suggested that the Fourth Amendment was applicable."

There is no merit at all in this argument. To begin with, we remind parties again that there is no duty to plead legal theories. See, *e.g., Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *Aaron v. Mahl*, 550 F.3d 659, 666 (7th Cir. 2008). It therefore does not matter whether the complaint mentioned the Fourth Amendment, the Fourteenth Amendment, or neither, so long as it provided adequate notice of the plaintiff's claim to the defendants. As for qualified immunity in particular, even though ideally an immunity defense should be resolved at the earliest stage possible, *Tamayo v. Blagojevich*, 526 F.3d 1074, 1090 (7th Cir. 2008), that is a guideline, not a rigid rule. Here, the district court did not abuse its discretion when it entertained the defendants' qualified immunity argument. See *Jogi v. Voges*, 480 F.3d 822,

836 (7th Cir. 2008) (district court may, in its sound discretion, consider belated assertion of qualified immunity defense in procedurally complex cases). Nothing approaching a jurisdiction problem bars our consideration of the court's ruling.

**III**

On the merits, the defendants' first contention is that Currie has failed to state a claim, since "[t]he Fourth Amendment does not govern the provision of medical services to [a pre-*Gerstein* hearing] arrestee by a contracted medical care professional." (In the interest of clarity, we use the term "arrestee" to refer to a person who has not had a *Gerstein* hearing; we use the term "pre-trial detainee" to refer to someone who has had a *Gerstein* hearing or its equivalent.) The fact that the defendants operate under a contract with the County is immaterial here, since they concede that they "provid[ed] their medical services under a government contract fulfilling a governmental function." See *West v. Atkins*, 487 U.S. 42 (1988) (delivery of medical treatment to prisoner by part-time contract physician qualifies as state action for purposes of 42 U.S.C. § 1983). The defendants' real argument is that the Fourth Amendment *never* governs constitutional claims alleging inadequate provision of medical care to an arrestee by a nurse or doctor, regardless of the defendant's employment arrangement.

Although the Supreme Court has provided relatively little guidance regarding the constitutional rights of arrestees and pretrial detainees, see *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (noting, without deciding, the question whether Fourth Amendment protections extend through the period of pretrial detention), this court's cases foreclose the defendants' argument. In *Villanova v. Abrams*, we held that

"the Fourth Amendment governs the period of confinement between arrest without a warrant and the [probable cause determination]," 972 F.2d 792, 797 (7th Cir. 1992), and we have since applied the Fourth Amendment's "objectively unreasonable" standard to both "conditions of confinement" and "medical care" claims brought by arrestees who have not yet had their *Gerstein* hearing. See *Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011) (medical care); *Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007) (medical care); *Sides v. City of Chicago*, 496 F.3d 820 (7th Cir. 2007) (medical care); *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) (conditions of confinement). Other courts have so ruled as well. See, *e.g., Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011); *Aldini v. Johnson*, 609 F.3d 858, 860 (6th Cir. 2010); *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1043 (9th Cir. 1996); see generally Catherine T. Struve, *The Conditions of Pretrial Detention,* 161 U. PENN. L. REV. 1009, 1013 (2013) (endorsing "familiar Fourth Amendment standard of reasonableness under the circumstances [to] govern the treatment of arrestees until there has been a judicial determination of probable cause").

The defendants attempt to distinguish *Ortiz*, *Williams*, and *Sides* as cases involving the objectively unreasonable denial of medical care by *jailers*, not the objectively unreasonable provision of medical care by *doctors and nurses*. A jailer might violate an arrestee's Fourth Amendment rights by unreasonably denying the arrestee access to insulin, the defendants urge, but a health care professional who unreasonably withholds insulin does not.

This argument lacks support in law or logic. "[T]he State [has] a constitutional duty to provide adequate medical treatment to those in its custody," and constitutional claims

may be brought against medical care providers, regardless of "the precise terms of [their] employment," when they "voluntarily assume[] that obligation by contract." *West*, 487 U.S. at 55-56. This basic principle, first announced in the Eighth Amendment context, applies with equal force to claims brought by pre-trial detainees who have had a probable cause hearing, see, *e.g.*, *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) (Fourteenth Amendment claim against nurses employed by Health Professionals, Ltd.), and to constitutional claims brought by arrestees who have not yet had a probable cause hearing. True, the named defendants in our earlier Fourth Amendment medical-care cases were "lockup keepers" (*Ortiz* and *Williams*) and police detectives (*Lopez*), but from the perspective of the arrestee, it matters not a whit whether it is the jailer or the doctor whose conduct deprives him of life-saving medical care. This is why our Fourth Amendment cases speak broadly of claims involving the "*provision* of medical care," *Ortiz*, 656 F.3d at 538, not simply the "*denial* of medical care by a jailer" (as the defendants would have it).

The defendants counter that we should recognize a special "carve out" for doctors and nurses because the Fourth Amendment's "objectively unreasonable" standard resembles the standard for the common law tort of negligence, and "Section 1983 is not intended for negligence." But the implicit premise behind that description of Section 1983 is that the constitutional provision at issue is the Fourteenth Amendment or the Eighth Amendment. We have no quarrel with the proposition that a prison inmate's complaint "that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth

Amendment," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). But different constitutional provisions, and thus different standards, govern depending on the relationship between the state and the person in the state's custody. See *Graham v. Connor*, 490 U.S. 386, 394-95 & n.10 (1989); *Belbachir v. County of McHenry*, No. 13-1002, slip op. at 4-7 (7th Cir. Aug. 12, 2013) (discussing constitutional standards in civil commitment, immigration, and criminal contexts).

During the (ordinarily brief) time between a warrantless arrest and a judicial determination of probable cause, before the state's interest in continued detention has been established, greater solicitude to presumptively innocent arrestees is warranted. Indeed, this concern prompted Justice Scalia to dissent in *Riverside*, because he thought that 48 hours was too long to satisfy the requirement of a prompt hearing—a requirement, he pointed out, that "had as its primary beneficiaries the innocent … those so blameless that there was not even good reason to arrest them." 500 U.S. at 71 (Scalia, J., dissenting). The *Riverside* majority was also concerned about the problem of "prolonged detention based on incorrect or unfounded suspicion." 500 U.S. at 52. (Okoro, unfortunately, was experiencing prolonged detention, and no one will ever know if the suspicion that led to his arrest was well-founded.) The relevant legal standard for arrestees who have been seized but who have not yet had their probable cause hearing, we conclude, comes from the Fourth Amendment, not the Fourteenth, and certainly not the Eighth. The issue is whether the state actor's "response to [the arrestee]'s medical needs was objectively unreasonable" and "caused the harm of which [the arrestee] complains." *Ortiz*, 656 F.3d at 530 (discussing factors that inform Fourth Amendment analysis). If jail officials fear that this framework might im-

pose too onerous a burden on them or their agents, there is an obvious solution: the responsible officials can ensure that arrestees receive a prompt determination of probable cause, as the Fourth Amendment already requires. See *Cnty. of Riverside*, 500 U.S. at 56; see also Struve, *The Conditions of Pretrial Detention*, *supra*, 161 U. PENN. L. REV. at 1013.

**IV**

The defendants next argue that even if their conduct violated Okoro's Fourth Amendment rights, qualified immunity is proper because no previous decision "applied the Fourth Amendment to analyze the reasonableness of health care provided by contracted medical professionals to arrestees being held by the police in jail."

If there is any lack of clarity in our previous cases, however, it is only with respect to the threshold issue whether the defense of qualified immunity is *ever* available to private medical care providers like the defendants. See *Sain v. Wood*, 512 F.3d 886 (7th Cir. 2008) (assuming, "for the purposes of this case only," that prison doctor may be entitled to assert qualified immunity). This ambiguity is of no help to the defendants: if private medical care professionals are categorically barred from claiming immunity, like guards employed by a privately run prison facility, *Richardson v. McKnight*, 521 U.S. 399 (1997), it is unnecessary to consider whether the defense may be invoked by Chhabra and Reynolds on these particular facts.

The Supreme Court recently considered the question whether "an individual hired by the government to do its work is prohibited from seeking [absolute or qualified] immunity, solely because he works for the government on

something other than a permanent or full-time basis." *Filarsky v. Delia*, 132 S. Ct. 1657, 1660 (2012). It held that "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis." *Id.* at 1665. On the other hand, the *Filarsky* Court reaffirmed the holding of *Richardson* categorically rejecting immunity for the private prison employees there; in so doing, the Court emphasized that the incentives of the private market suffice to protect employees when "a private firm, systematically organized to assume a major lengthy administrative task ... for profit and potentially in competition with other firms," assumes responsibility for managing an institution. 132 S.Ct. at 1667 (quoting *Richardson*, 521 U.S. at 413).

In a detailed opinion tracking the Court's analysis in *Filarsky*, the Sixth Circuit recently held that a doctor providing psychiatric services to inmates at a state prison is not entitled to assert qualified immunity. *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012) (discussing the historical roots of immunity for similarly situated parties and the history and purpose of § 1983); see also *Hasher v. Hayman*, 2013 WL 1288205 (D.N.J. Mar. 27, 2013) (private medical employees failed to establish that they are entitled to assert a qualified immunity defense, "even after *Filarsky*"). We find the Sixth Circuit's reasoning persuasive, though we need not definitively decide the issue today; even if our defendants were entitled to seek qualified immunity as a general matter, we would conclude that the defense is not applicable here.

The contours of Okoro's Fourth Amendment rights were "sufficiently clear that a reasonable official would understand that what he is doing violates that right" throughout

the period of Okoro's detention. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Chhabra and Reynolds urge otherwise, based only on the argument that our previous Fourth Amendment medical care cases spoke only of "officers" (and not "medical care providers"). That is too slender a reed for us, particularly since officials can be "on notice that their conduct violates established law" even in the absence of "earlier cases involving 'fundamentally similar' [or] 'materially similar' facts." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As we already have explained, nothing in our opinions hints at some special Fourth Amendment exemption for health care professionals; we discussed wrongdoing by "officers" and "lockup keepers" because those were the positions the defendants held. Indeed, we rejected an argument much like Chhabra and Reynolds' in *Ortiz*, where the defendants urged that in 2004 (the time of the alleged wrongdoing in that case) "no decision had applied the Fourth Amendment to analyze the reasonableness of the provision of medical care to arrestees." 656 F.3d at 538. We acknowledged that this was probably true, since *Williams* and *Sides* were not decided until three years later, but even then we rejected the defense. It was "quite clear" in 2004, we said, "that the Fourth Amendment protects a person's rights until she has had a probable cause hearing." *Id.* It was no less clear in December 2008, when Okoro collapsed in his cell, that the same Fourth Amendment standard applies to the wrongdoing alleged here.

Finally, the defendants suggest they are entitled to qualified immunity because "[t]here is nothing indicating that [Chhabra and Reynolds] had any understanding of the decedent's status," and thus, they had no way of knowing that the Fourth Amendment, rather than some more forgiving

constitutional provision, would govern this particular arrestee's medical care. This argument is not altogether frivolous, since qualified immunity may apply to some mistakes of fact, see *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009), but it cannot prevail here. It assumes that health care providers calibrate the level of medical care they provide to a jail inmate based on their assessment of the inmate's legal status, taking advantage of the right to be sloppy where the standard is lower. We sincerely hope that this is not how Chhabra, Reynolds, and Health Professionals, Ltd. go about caring for those in the State's custody. Indulging the possibility that the defendants really do undertake such a crass triage, however, we would expect them to exercise particular care in sorting the jail's residents into the proper constitutional camps, particularly after our 2007 decisions in *Williams* and *Sides*. See *Crowder v. Lash*, 687 F.2d 996, 1007 (7th Cir. 1982) ("A reasonably competent public official is expected to know the law governing his conduct."). If the defendants truly tailor their care (or lack thereof) in this fashion, then their failure to ascertain Okoro's correct status cannot be characterized as a "reasonable" mistake, and their qualified immunity claim still fails. *Saucier*, 533 U.S. at 205 ("The concern of the immunity inquiry is to acknowledge that *reasonable* mistakes can be made … .") (emphasis added).

Moreover, as we already indicated at the outset, we do not consider any argument based on the Fourteenth Amendment to be forfeited. This record easily supports a finding of deliberate indifference to Okoro's serious medical condition. In short, these defendants had no reason to think that their actions would be measured by anything less than the Fourteenth Amendment's standard, which has applied to pretrial detainees for decades.

**V**

We AFFIRM the order of the district court denying qualified immunity to Chhabra and Reynolds and REMAND for further proceedings consistent with this opinion.